1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD GULBRANDSEN,
Derivatively on Behalf of WELLS
FARGO & COMPANY

                    Plaintiff,

         v.

JOHN H. STUMPF, et al.,

                    Defendants.

Case No.: C-12-05968 JSC

**ORDER GRANTING MOTION TO DISMISS**

        In this shareholder derivative action, Plaintiff seeks to hold Defendants liable for Wells Fargo & Company's alleged misconduct in misreporting the health of the home mortgage loans it sought to have insured through the Federal Housing Administration ("FHA").  Presently before the Court is Defendants' motion to dismiss.  (Dkt. No. 39.)  After carefully reviewing the parties' submissions, and having had the benefit of oral argument on May 9, 2013, the Court GRANTS the motion.  Among other things, Plaintiff has failed to allege sufficient particularized facts to excuse demand on Wells Fargo & Company's Board of Directors.

**ALLEGATIONS OF THE COMPLAINT**

From May 2001 through December 2010, Wells Fargo & Company ("Wells Fargo") improperly certified to the United States Department of Housing and Urban Development ("HUD") that over 100,000 of its high-risk residential mortgage loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance.  Under the FHA Direct Endorsement program, HUD insured the loans that Wells Fargo was originating.  This program is intended to help low- to moderate-income families become homeowners by encouraging mortgage lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.  In the event that a borrower defaults on an FHA-insured mortgage, the lender or other party holding the mortgage submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property.  HUD then pays off the balance of the mortgage and other related costs and may assume ownership of the property.  The Direct Endorsement program grants the lender the authority to decide whether the borrower represents an acceptable credit risk for HUD, and to certify loans for FHA mortgage insurance without prior HUD review or approval.

The Individual Defendants[1]—all current or former members of Wells Fargo's Board of Directors ("Board") or Wells Fargo executives —"knew or recklessly disregarded" that a very substantial percentage of Wells Fargo's loans had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.  (Dkt. No. 1 ¶ 2.)  In addition, the Individual Defendants "caused Wells Fargo to conceal" from HUD that it was having very serious loan quality problems and failed to self-report, as required, loans that did not qualify for FHA insurance.  (*Id.* at ¶ 70.)  The Individual Defendants engaged in this misconduct in an effort to increase loan volume.

Further, the Individual Defendants were alerted to "multiple red flags" through Wells Fargo's internal reviews of its mortgage portfolio.  (*Id.* at *27.)  Wells Fargo's home mortgage division's

---

[1]  The Individual Defendants who were or are Wells Fargo executives are John G. Stumpf, Richard M. Kovacevich, and Howard I. Atkins.  The remaining 21 Individual Defendants are or were outside directors.  Collectively, the Individual Defendants and Wells Fargo are the "Defendants."  For diversity jurisdiction purposes, Wells Fargo is considered a defendant.  *See In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1237-38 (9th Cir. 2008).

quality control function comprised both the Fraud Risk Management ("FRM") and Quality Assurance ("QA") departments.  The QA department's procedures included the following with respect to FHA-insured loans: monthly reviews of a random sample of loans originated and sponsored within the prior sixty days, reviews of at least some portion of its loans that were in early default, and preparation and circulation of internal reports of the reviews' findings.  The FRM department also reviewed loans referred to it as potentially involving fraud or misrepresentations.  Between 2001 and 2010, Wells Fargo's monthly reviews identified over 6,000 "materially deficient" loans, *i.e.*, loans that did not qualify for FHA insurance.  These reports were made to "senior management," and then "shared with the Board because as explained in Wells Fargo's Corporate Governance Guidelines, '[t]he business of [Wells Fargo] is managed under the direction of its Board' and the Board 'delegates the conduct of business to the Company's officers, managers and employees.'"  (*Id.* at ¶ 78 (alterations in original).)  During a seven-month stretch from April 2001 through October 2002, the material violation rate never dipped below 42% and reached as high as 48%, meaning that nearly one out of every two retail FHA loans that Wells Fargo certified to HUD did not qualify for insurance.  Wells Fargo's internal benchmark for material violations was set at 5%.

Despite these reports, no effective action was taken to correct the business practice.  According to a memorandum dated April 8, 2004, the Vice President of Division Quality Management indicated that a working group would convene to address reporting the material violations to HUD.  However, no self-reporting of the material violations occurred.  Rather, the working group narrowed Wells Fargo's reporting obligations, determining that only instances of systemic fraud need to be reported to HUD.  Wells Fargo did not report a single material violation prior to October 2005.

In early 2006, "in response to questioning by HUD," the Division Presidents of Wells Fargo Home Mortgage assured HUD that the company would follow HUD's interpretation of the reporting requirements, which demand that the lender report individual instances of material violations.  (*Id.* at ¶ 121.)  Although Wells Fargo began to self-report its deficient loans following HUD's inquiry, the company self-reported fewer than 250 loans in a five-year period.  From 2002 through 2010, Wells

United States District Court
Northern District of California

3

Fargo failed to report 6,320 materially deficient loans, resulting in FHA's payment of nearly $190 million in FHA benefits on defaulted mortgage loans.

The United States Attorney's Office for the Southern District of New York filed suit against Wells Fargo on October 9, 2012, seeking to recover damages in connection with Wells Fargo's participation in the FHA insurance program.

The present Complaint includes three causes of action against Defendants: 1) breach of fiduciary duty; 2) waste of corporate assets; and 3) unjust enrichment.

## DISCUSSION

Defendants move to dismiss the Complaint on four grounds 1) failure to plead particularized facts demonstrating that a pre-suit demand on the Board would have been futile; 2) failure to plead non-speculative harm to Wells Fargo; 3) lack of standing; and 4) failure to allege an underlying cause of action.

## I.    Demand Futility

### A.    Legal Standard

Rule 23.1(b)(3) of the Federal Rules of Civil Procedure requires a plaintiff bringing a derivative action to, among other things, "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 96 (1991) (internal quotation marks and alterations omitted). Rule 23.1, however, does not establish the circumstances under which demand would be futile. *See id.* For these standards, courts turn to the law of the state of incorporation; in this instance, Delaware. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), *superseded by statute on other grounds*.

Delaware law provides two demand-futility tests, as set forth in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). When a plaintiff challenges one or more specific transactions authorized by the board of directors, or other express decisions or conduct

1   of the board, a court should employ the *Aronson* test.  *Aronson* evaluates whether, under the

2   particularized facts alleged, a reasonable doubt is created that1)  the directors are disinterested and

3   independent, or 2) the challenged transaction was otherwise the product of a valid exercise of business

4   judgment.  *Aronson*, 473 A.2d at 812; *see also In re Oracle Corp. Derivative Litigation*, 2011 WL

5   5444262*,* at *2 (N.D. Cal. Nov. 9, 2011).  *Rales* provides an alternative test that applies "[w]here

6   there is no conscious decision by directors to act or refrain from acting."  *Rales*, 634 A.2d at 934.

7   Under *Rales*, demand is futile when "the particularized factual allegations of a derivative stockholder

8   complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors

9   could have properly exercised its independent and disinterested business judgment in responding to a

10   demand."  *Id*.

11        "To plead demand futility, a stockholder plaintiff must plead facts establishing a sufficient

12   connection between the corporate trauma and the board such that at least half of the directors face a

13   substantial likelihood of personal liability."  *South v. Baker*, 62 A.3d 1, 9 (Del. Ch. 2012).  A plaintiff

14   can plead the necessary connection by alleging with particularity either: 1) "actual director

15   involvement in a decision or series of decisions that violated positive law;" 2) "that the board

16   consciously failed to act after learning about evidence of illegality—the proverbial 'red flag;'" 3)

17   "that a board of directors is dominated or controlled by key members of management, who the rest of

18   the board unknowingly allowed to engage in self-dealing transactions;" or 4) that the board failed to

19   engage in adequate oversight as required under *In re Caremark Intern. Inc. Derivative Litig.*, 698

20   A.2d 959 (Del. 1996).  *Id.*  Plaintiff's Complaint grounds demand futility on the first two bases.

### B.        Whether the Certificate of Incorporation Affects Demand Futility

22        As a threshold matter, the Individual Defendants argue that Wells Fargo's Restated Certificate

23   of Incorporation contains an exculpatory provision that further increases Plaintiff's pleading

24   requirement, even for Plaintiff's breach of the duty of loyalty claim.[2]  The Court is unpersuaded.

---

[2]  Plaintiff objects to the Individual Defendants' Request for Judicial Notice ("RJN").  (Dkt. Nos. 42 &
51.)  The Court does not rely on the documents included in the RJN except the Renewed Certificate of
Incorporation.  Plaintiff objects to the Court taking judicial notice of this document only to the extent
the Court accepts as true the statements contained therein.  (Dkt. No. 51 at 2.)  Because the Court is
merely taking notice of the document, and not accepting as true the facts contained therein, Plaintiff's
objection is denied.

The relevant provision limits a director's personal liability for a breach of fiduciary duty to "any breach of the director's duty of loyalty to the corporation or its stockholders . . . , acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, [unlawful payment of a dividend], or . . . for any transaction from which the director derived an improper personal benefit." (Dkt. No. 41-1 at 8.)  This exculpatory clause exempts director liability to the extent allowed under Delaware law.  8 Del. C. § 102(b)(7).  "[I]n the event that the charter insulates the directors from liability for breaches of the duty of care, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts."  *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003).  Plaintiff has alleged a non-exculpated claim—breach of the duty of loyalty—and he agrees that he must allege particularized facts to support that claim.  *See In re Verifone Holdings, Inc. Shareholder Derivative Litigation*, 2009 WL 1458233 *11 (N.D. Cal. May 26, 2009) (declining to consider exculpatory provision in connection with claims for breach of duty of loyalty).

The Individual Defendants argue that "[w]here, as here, the exculpatory clause limits individual liability to fraudulent, illegal, or bad faith conduct, demand is excused only if the complaint pleads specific facts that 'the directors acted with scienter, i.e., that they had actual or constructive knowledge that their conduct was legally improper.'"  (Dkt. No. 39 at 9 (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009).)  The exculpatory clause at issue here, however, does not limit individual liability to merely "fraudulent, illegal, or bad faith conduct;" rather, the clause specifically allows directors to be held liable, without qualification, for "any breach of the director's duty of loyalty to the corporation or its stockholders."  Thus, the Individual Defendants' authority is inapposite.  In *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008), the court held that allegations of scienter were required where an exculpatory provision in an LLC's operating agreement exempted directors from all liability except in case of "fraudulent or illegal conduct."  The Delaware statute that allowed such exculpatory clauses—the Limited Liability Company Act ("LLCA")—permits LLCs to eliminate director liability for *all* fiduciary duties, excepting only those actions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing.  *Id.*; 6 Del. C. § 18-1101.  The court accordingly held that "[t]herefore, under the Operating

United States District Court
Northern District of California

1    Agreement and the LLCA, the MME directors' exposure to liability is limited to claims of 'fraudulent

2    or illegal conduct,' or 'bad faith violation[s] of the implied contractual covenant of good faith and fair

3    dealing.'"  *Wood*, 953 A.2d at 141.  *Wood* does not stand for the proposition that the mere presence of

4    an exculpatory provision requires allegations of scienter even for a duty of loyalty claim.  Indeed, the

5    clause in *Wood* exculpated such claims, which is not an option here given that Delaware law does not

6    permit a corporation such as Wells Fargo to exculpate duty of loyalty claims.  To the extent courts

7    have relied on *Wood* to require allegations of scienter for duty of loyalty claims where such claims are

8    non-exculpable, those courts have not explained why such an extension is appropriate and they are

9    therefore unpersuasive.  *See In re Citigroup*, 964 A.2d at 124-25 (citing *Wood* but failing to explain

10   why it requires a scienter pleading requirement for a duty of loyalty claim).

11          **C.      The *Rales* Test[3]**

12          At the time the Complaint was filed Wells Fargo had 15 directors, 13 of whom are Individual

13   Defendants and all but one who are outside directors.  To proceed as a derivative action, Plaintiff must

14   plead particularized facts that show that at least eight directors face a substantial likelihood of

15   personal liability.  Plaintiff presents three arguments as to why the Individual Defendants are

16   connected to the company's wrongdoing for purposes of establishing demand futility.  All three

17   arguments fail.

18          First, Plaintiff contends that "the sheer magnitude and duration of the HUD violations shows

19   that the Board Defendants acted knowingly or in conscious disregard of their duties."  (Dkt. No. 50 at

20   13.)  However, as the Individual Defendants contend, arguments similar to Plaintiff's have been

21   rejected.  "A stockholder cannot displace the board's authority [over the corporation's claims] simply

22   by describing the calamity and alleging that it occurred on the directors' watch."  *South*, 62 A.3d at 8.

23   In *Oracle*, the plaintiffs alleged that the director defendants had breached their fiduciary duty in

24   permitting the company to overcharge the United States over $1 billion for software and licenses over

25   an eight year period.  *In re Oracle*, 2011 WL 5444262, at *1.  The court rejected plaintiffs' argument

26   that "because the purported overbilling occurred in the context of a large and pervasive 'scheme' over

27   _____

28   [3]  Plaintiff concedes that the *Rales* test, not the *Aronson* test, applies to this case.  Plaintiff states that
     "the *Rales* test likely applies to the majority of the Plaintiff's allegations," and makes the conclusory
     assertion that if *Aronson* does apply, he has satisfied that test as well.  (Dkt. No. 50 at 12 n.13.)

United States District Court
Northern District of California

an extended time period, and involved an important Oracle customer (the U.S. Government) and large sums of money, the outside directors simply must have known." *Id.* at *4.  The court reasoned that "Plaintiffs have not explained why it would be reasonable to infer that any of the outside directors would or should have had access to the detailed and voluminous data and calculations that presumably would have been necessary to determine whether Oracle was in compliance with its obligations to the Government under those rules and procedures." *Id.*  As in *Oracle*, Plaintiffs have not alleged particularized facts that allow the Court to draw an inference that any director knew or should have known about the alleged scheme.  As discussed below, Plaintiff has not adequately alleged that any director received any information that Wells Fargo was misreporting loan quality.  In addition, while the existence of incentive structures to increase loan origination regardless of quality suggest Wells Fargo was engaged in an unsound business practice, Plaintiff fails to connect any director to the creation or oversight of these incentive structures, let alone explain the connection with the failure to report material violations to HUD.

Plaintiff's cited authority is inapposite.  In *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806-808 (7th Cir. 2003), the chairman of the board received two "warning letters" from the government, company representatives met with the FDA "at least ten times" about violations of federal regulations, and the *Wall Street Journal* published a story on violations.  The facts alleged in Plaintiff's Complaint do not approach those in *Abbott Labs.*, where "there was no real question . . . that the board of directors had actual, and detailed, knowledge of the alleged wrongdoing." *Oracle*, 2011 WL 5444262, at *5.  In *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010), the court found demand excused because the "Complaint detail[ed] at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it."  While the court noted that the sheer scope and duration of the misconduct supported excusing demand, that fact alone was not dispositive.  *See id.*  As discussed below, Plaintiff has not adequately alleged that any director received a report detailing the alleged regulatory violations.  Finally, in *In re Massey Energy Co.*, 2011 WL 2176479, at *19 (Del. Ch. May 31, 2011) the court, on a motion for preliminary injunction, found demand excused where the company itself had already pled guilty to criminal charges for a

8

mine fire that killed two people, was caught trying to hide violations of the law, and had multiple civil

settlements for mine safety violations.  The facts alleged in Plaintiff's Complaint are not analogous.

*Cf. Holt v. Golden*, 880 F. Supp. 2d. 199, 204 (D. Mass. 2012) (rejecting plaintiff's argument that

*Massey* allows for a reduced pleading standard where the scope of potential liability is substantial).

Plaintiff's second argument relies on the existence of Wells Fargo's internal monthly reports

and memoranda, which Plaintiff contends "demonstrate that the Company's violations of HUD

requirements were common-knowledge within the Company and pierced the confines of the

boardroom."  (Dkt. No. 50 at 14.)  Plaintiff, however, does not connect this argument with any

allegations in the Complaint; Plaintiff has not alleged facts that suggest that these monthly reports

"pierced the confines of the boardroom."

At oral argument Plaintiff emphasized that because a majority of the Board serves on the

Audit and Examination Committee, and the Committee is responsible for "the enterprise-wide

compliance risk management program, the general condition of compliance in the Company, common

issues across business lines, significant violations of statutes and regulations . . . with corrective

actions and schedules for resolution, [and] the reputation risks of significant compliance exposures

and other high-risks concerns" (Complaint ¶ 40), the Committee members (and thus a majority of the

Board) must have known of Wells Fargo's violation of HUD's regulations.  The caselaw, however, is

to the contrary.  *See, e.g.*, *South*, A.3d at 11 n.6 ("As numerous Delaware decisions make clear, an

allegation that the underlying cause of a corporate trauma falls within the delegated authority of a

board committee does not support an inference that the directors on that committee knew of and

consciously disregarded the problem for purposes of Rule 23.1."); *In re Citigroup*, 964 A.2d at 135

("Although the members of the ARM Committee were charged with reviewing and ensuring the

accuracy of Citigroup's financial statements under the ARM Committee charter, director liability is

not measured by the aspirational standard established by the internal documents detailing a company's

oversight system."); *In re Verifone Holdings, Inc. S'holder Derivative Litig.*, 2009 WL 1458233, at *8

(N.D. Cal. May 26, 2009) ("It is conclusory to state that the directors knew about the internal

problems in accounting because they were on the Audit Committee.")  While "[a] claim that an audit

committee or board *had notice* of serious misconduct and simply failed to investigate, for example,

United States District Court
Northern District of California

1   would survive a motion to dismiss, even if the committee or board was well constituted and was

2   otherwise functioning," *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5

3   (Del. Ch. Feb. 13, 2006), Plaintiff only speculates that the Audit Committee members had notice of

4   the reports and memorandum.  Such speculation is not enough.  Plaintiff's cited authority is not to the

5   contrary.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 277–78 (S.D.N.Y. 2006)

6   (finding demand excused where specific factual allegations demonstrated that the audit committee

7   was aware of deficiencies in the internal controls over financial reporting and knew of the company's

8   violations of federal export laws that threatened the future viability of the company); *see also  Rosky*

9   *ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *3 (M.D. Fla. Mar. 30, 2009)

10  (finding demand on audit committee members excused because of "sufficient factual details"

11  contained in the complaint, but not explaining what those facts were).

12          Plaintiff also asserts that the internal reports and memoranda detailing the rate of material

13  violations "circulated among management, which included defendant Stumpf (who later ascended to

14  the Board as Chairman)."  (Dkt. No. 50 at 14.)  However, Plaintiff's Complaint does not actually

15  allege that Stumpf was aware of the reports; rather, Plaintiff generally alleges that these reports were

16  made to "senior management," which may or may not include Stumpf, the company's CEO during

17  part of the relevant time period.  (Dkt. No. 1 ¶ 78.)  Plaintiff must allege more.

18          Finally, Plaintiff argues that even if the Board Defendants "could somehow plead ignorance of

19  the numerous internal reports and memorandum evidencing the Company's HUD violations . . . , the

20  Board could not ignore these violations once HUD initiated an inquiry into the Company's non-

21  compliance in 2005 and these violations were staring them in the face."  (Dkt. No. 50 at 15.)

22  Plaintiff's Complaint, however, does not allege that any member of the Board was actually aware of

23  the inquiry or allege facts upon which such awareness may be inferred.  Rather, Plaintiff merely

24  alleges that the Division Presidents of Wells Fargo Home Mortgage responded to the inquiry, stating

25  that the company would address HUD's concerns.  (*See* Dkt. No. 1 ¶ 121.)  Further, Plaintiff's

26  Complaint does not even describe the nature or form of the 2005 inquiry; the inquiry is referenced

27  only in relation to Wells Fargo's response to it in early 2006.  (*Id.*)  Without these facts, the Court

28  cannot infer that HUD's inquiry was of such a nature that it would be expected that Board members,

1    and perhaps Audit Committee members in particular, would be aware of HUD's concerns with Wells

2    Fargo's regulatory compliance sufficient to excuse demand.

3           Because Plaintiff's Complaint fails to allege particularized facts that raise a reasonable doubt

4    that a majority of the Board of Directors could have properly exercised its independent and

5    disinterested business judgment in responding to a demand, Plaintiff's Complaint is dismissed with

6    leave to amend.

7    **II.      Lack of Damages**

8           The Individual Defendants also move to dismiss the Complaint because Plaintiff has failed to

9    plead non-speculative harm to Wells Fargo.  The Individual Defendants do not articulate the doctrinal

10   basis for this dismissal—standing, Rule 12(b)(6), etc.—and the cases they cite apply the theory of

11   dismissal in various ways.  *See, e.g.*, *Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607, 610

12   (Del. Super. 1977) (dismissing derivative suit alleging breach of fiduciary duties where the

13   "undisputed facts of record show that no cause of action is alleged which would support the relief

14   claimed by plaintiffs" because "what the complaint seeks from the individual defendants is a return of

15   their compensation rather than either specified or general damages for wrongs against the

16   corporation."); *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, --- F. Supp. 2d ---, 2013 WL

17   525158, at *24-25 (S.D.N.Y. Feb. 13, 2013) (analyzing damages issue under the ripeness doctrine and

18   determining that derivate action is premature for failing to allege non-speculative damages); *In re*

19   *United Telecomms. Inc., Secs. Litig.*, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993) (same); *In re*

20   *Symbol Technologies Securities Litigation*, 762 F. Supp. 510, 517 (E.D.N.Y. 1991) (analyzing

21   damages separate from Rule 12(b)(6), though not invoking any jurisdictional doctrine ); *In re Cray*

22   *Inc.*, 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006) (same).

23          The Court is not yet persuaded that allegations of non-speculative damages are an element of a

24   derivative action.  As noted at oral argument, and as the cases cited above demonstrate, most courts

25   that dismiss a derivative action because of insufficient damages allegations appear to do so in the

26   context of ripeness and thus subject matter jurisdiction.  *See also In re Cedant Corp. Derivative*

27   *Action Litigation*, 189 F.R.D. 117, 134-35 (D.N.J. 1999) (noting defendant's argument that "the claim

28   for potential liability and costs is premature and should be dismissed because it violates the 'case and

United States District Court
Northern District of California

11

controversy' requirement of Article III); *In re RasterOps Corp. Securities Litigation*, 1993 WL 476651 *3 (N.D. Cal. Sep. 10, 1993) (holding that damages allegations were sufficient to find plaintiff's claims ripe for adjudication").   As Defendants did not make their damages argument in the context of subject matter jurisdiction, the Court declines to grant the motion to dismiss on this ground.

**III.    Standing**

The Individual Defendants argue that Plaintiff's Complaint must be dismissed for lack of standing to the extent that the claims rely on wrongdoing that occurred before Plaintiff became a Wells Fargo shareholder.  Although Plaintiff became a shareholder in October 2002, he alleges that the misreporting scheme began in May 2001.  In a shareholder derivative case, Federal Rule of Civil Procedure 23.1 provides that a complaint must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of," which the Ninth Circuit interprets as requiring that "a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit."  *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983).  Plaintiff argues that Delaware law provides an exception to this requirement whereby a plaintiff has standing to bring a derivative claim based on a "continuing wrong."  *See Desimone v. Barrows*, 924 A.2d 908, 925 (Del. Ch. 2007) (stating that the continuing wrong doctrine "is a narrow one that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed").  Plaintiff argues that the doctrine applies because "the crux of [his] Complaint is that the Individual Defendants breached their fiduciary duties as part of a single and continuous business strategy from 2001 to 2010 to drive-up the volume of FHA loans by violating HUD requirements.  The Complaint does not challenge multiple, independent transactions, nor does it seek to recover on separate counts for each and every violation during the relevant period."  (Dkt. No. 50 at 24 n.25.)

Although not discussed by the parties, it appears the Ninth Circuit has yet to adopt the continuing wrong doctrine.  Further, the Ninth Circuit has held that Rule 23.1's continuous ownership requirement applies in diversity cases and plaintiffs therefore cannot resort to state law.  *Kona Enterprises, Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999).  Thus, whether Delaware law applies the doctrine is beside the point.  While some district courts within this Circuit have applied the

1   doctrine, others have not.  *Compare Bilunka v. Sanders*, 1994 WL 447156, at *2 (N.D. Cal. Mar. 1,

2   1994) (applying continuing wrong exception where the parties agreed Delaware law applied) *and In*

3   *re Google, Inc. S'holder Derivative Litig.*, 2012 WL 1611064, at 11 n.4 (N.D. Cal. May 08, 2012)

4   (considering doctrine but finding the "extremely narrow" exception inapplicable under the facts of the

5   case) *with Sprando ex rel. Intern. Game Tech. v. Hart*, 2011 WL 3055242, at *3 (D. Nev. July 22,

6   2011) ("We are unable to find support in this Circuit that the continuing wrong exception is

7   applicable.")

8          Given that Plaintiff has not shown that the continuing wrong exception is recognized in this

9   Circuit, Plaintiff's Complaint is dismissed to the extent it relies solely on conduct that occurred prior

10  to October 2002.  The Court notes that the practical effect of dismissal on this basis is minimal, if it

11  has any effect at all.  The bulk of the misconduct occurred after Plaintiff became a shareholder.  The

12  Individual Defendants do not, and cannot, argue that Plaintiff, if he is able to amend his complaint to

13  plead demand futility, is precluded from otherwise pursuing his claims for continuing misconduct that

14  occurred after October 2002.

15  **IV.    Failure to State a Claim**

16         **A.    Legal Standard**

17         A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough

18  facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

19  570 (2007).  A facial plausibility standard is not a "probability requirement" but mandates "more than

20  a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

21  (internal quotations and citations omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the

22  court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light

23  most favorable to the non-moving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

24  1025, 1031 (9th Cir. 2008).  "[D]ismissal may be based on either a lack of a cognizable legal theory

25  or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside*

26  *Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see*

27  *also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a

28  claim on the basis of a dispositive issue of law").

13

1   Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under

2   which a party is only required to make "a short and plain statement of the claim showing that the

3   pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation

4   of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.

5   at 555.)  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a

6   motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*,

7   652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply

8   recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to

9   give fair notice and to enable the opposing party to defend itself effectively"), *cert. denied*, 132 S. Ct.

10  2101 (2012). The court must be able to "draw the reasonable inference that the defendant is liable for

11  the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible

12  claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial

13  experience and common sense." *Id.* at 663-64.

14      If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request

15  to amend the pleading was made, unless it determines that the pleading could not possibly be cured by

16  the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal

17  quotation marks and citations omitted).

18      **B.**      **Analysis**

19          **1.**      **Breach of the duty of loyalty**

20      As an initial matter, the parties dispute whether the heightened pleading standards of Rule 9(b)

21  apply because Plaintiff's claims "sound in fraud."  Because Plaintiff's complaint fails under even the

22  lower pleading standard of Rule 8(a), the Court need not consider the matter.

23      As noted above, "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that

24  a fiduciary duty existed and (2) that the defendant breached that duty." *In re Mobilactive*, 2013 WL

25  297950, at *21. Although Plaintiff is correct that the pleading standard for a motion to dismiss under

26  Rule 12(b)(6) is not as high as under Rule 23.1, Plaintiff's Complaint fails to allege that any

27  Individual Defendant breached his or her duty of loyalty.  Plaintiff's Complaint simply concludes that

28  the Individual Defendants actively participated in the misreporting scheme or recklessly ignored "red

United States District Court
Northern District of California

1  flags."  For reasons already stated, the Court cannot reasonably infer from these conclusory

2  allegations that any Individual Defendant knew of the misreporting, let alone actively carried out the

3  scheme.  The motion is accordingly granted on this additional basis.

4      **2.**    **Corporate Waste**

5      A claim for waste "is a stringent one and requires that the plaintiff plead facts showing that no

6  person of ordinary sound business judgment could view the benefits received in the transaction as a

7  fair exchange for the consideration paid by the corporation."  *In re Lear Shareholder Litig.*, 967 A.2d

8  640, 656 (Del. Ch. 2008) (internal quotation marks and citation omitted).  Plaintiff alleges that the

9  Individual Defendants wasted corporate assets by expending resources defending the New York

10  action, and "paying improper compensation and bonuses to certain of its executive officers and

11  directors that breached their fiduciary duty."  (Dkt. No. 1 ¶ 152.)  As already discussed, Plaintiff's

12  allegations regarding the Individual Defendants' breach of their fiduciary duties are inadequate.  Thus,

13  Plaintiff's claim for corporate waste, which is predicated on that breach, also fails.

14      **3.**    **Unjust Enrichment**

15      To state a claim for unjust enrichment, a plaintiff must show: (i) enrichment; (ii)

16  impoverishment; (iii) a relation between the enrichment and impoverishment; (iv) the absence of

17  justification; and (v) the absence of a remedy provided by law.  *Jackson Nat'l Life Ins. Co. v.*

18  *Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).  Plaintiff argues that the Individual Defendants profited

19  at the expense and to detriment of Wells Fargo by accruing substantial compensation while engaging

20  in conduct in contravention of their fiduciary duties owed to the company.  For reasons discussed

21  elsewhere, Plaintiff's unjust enrichment claim is dismissed since it is premised on Plaintiff's

22  conclusory allegation that the Individual Defendants breached their fiduciary duties.

23               **CONCLUSION**

24      For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss.  An amended

25  complaint, if any, shall be filed within 30 days of the date of this Order.[4]  An Initial Case

26    [4]  In their reply, the Individual Defendants argue that the Complaint should be dismissed without

27  leave to amend because "Plaintiff quite obviously filed this case by piggy-backing the allegations of the SDNY Complaint and without conducting an appropriate presuit investigation."  (Dkt. No. 52 at

28  14.)  The Court, however, grants dismissal with leave to amend because it is possible that Plaintiff could cure the defects in his Complaint by alleging additional facts.

Management Conference is scheduled for September 5, 2013 at 1:30 p.m.  Should Defendants decide not to move to dismiss any amended complaint, the parties are invited to stipulate to an earlier case management conference.

This Order disposes of Docket No. 24.

IT IS SO ORDERED.

Dated: May 9, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California

16