ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
FELIPE J. ARROYO (163803)
farroyo@ robbinsarroyo.com
SHANE P. SANDERS (237146)
ssanders@ robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD GULBRANDSEN, Derivatively on Behalf of WELLS FARGO & COMPANY,<br><br>                          Plaintiff,<br>            v.<br><br>JOHN G. STUMPF, CYNTHIA H. MILLIGAN, PHILIP J. QUIGLEY, SUSAN G. SWENSON, JUDITH M. RUNSTAD, ENRIQUE HERNANDEZ, JR., LLOYD H. DEAN, NICHOLAS G. MOORE, JOHN D. BAKER II, SUSAN E. ENGEL, STEPHEN W. SANGER, JOHN S. CHEN, DONALD M. JAMES, RICHARD M. KOVACEVICH, HOWARD I. ATKINS, J.A. BLANCHARD, III, REATHA CLARK KING, ROBERT L. JOSS, RICHARD D. MCCORMICK, MICHAEL W. WRIGHT, DONALD B. RICE, BENJAMIN F. MONTOYA, ROBERT K. STEEL, and MACKEY J. MCDONALD,<br><br>                          Defendants,<br><br>      -and-<br><br>WELLS FARGO & COMPANY, a Delaware corporation,<br><br>                          Nominal Defendant. | Case No. 3:12-cv-05968-JSC<br><br>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

1

## NATURE AND SUMMARY OF THE ACTION

2      1.      This is a verified amended shareholder derivative action brought by plaintiff, a

3  shareholder of Wells Fargo & Company ("Wells Fargo" or the "Company"), on behalf of the

4  Company against certain of its current and former officers and directors.  This action seeks to

5  remedy the defendants' violations of law addressed herein, including breach of fiduciary duty,

6  waste of corporate assets, and unjust enrichment that have caused substantial damage to Wells

7  Fargo.

8      2.      This action arises out of the Individual Defendants' (as defined herein) illicit

9  business practices concerning the Company's involvement in the origination, underwriting, and

10 reporting of materially deficient residential mortgage loans.  As set forth more fully below, Wells

11 Fargo, the nation's largest residential mortgage lender, engaged in these improper business

12 practices over the course of almost a decade, from May 2001 through December 2010.  During

13 this extensive period, Wells Fargo improperly certified to the United States Department of

14 Housing and Urban Development ("HUD") that over 100,000 of its high-risk residential

15 mortgage loans met HUD's requirements for proper origination and underwriting and, therefore,

16 were eligible for the Federal Housing Administration's ("FHA") insurance.  In so doing, the

17 Individual Defendants shifted responsibility for these materially deficient loans to the United

18 States Government.  Under the FHA Direct Endorsement program, HUD insured the loans that

19 Wells Fargo was originating.   Thus, when the loans defaulted, it was the United States

20 Government on the hook, not the Company.

21     3.      The extremely poor quality of Wells Fargo's loans was a function of the

22 Company's singular focus on increasing the volume of FHA residential mortgage loans, rather

23 than on the quality of the loans being originated.  The Company's actions in implementing this

24 plan included: (i) hiring temporary staff to churn out and approve an ever-increasing quantity of

25 FHA loans; (ii) failing to provide its inexperienced staff with proper training; (iii) paying

26 improper bonuses to its underwriters to incentivize them to approve as many FHA loans as

27 possible; and (iv) applying pressure on loan officers and underwriters to originate and approve

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

more and more FHA loans as quickly as possible.  As a consequence of Wells Fargo's misconduct, the FHA was required to pay hundreds of millions of dollars in insurance claims on defaulted loans that the Company had falsely certified met HUD's requirements.

4.     The Individual Defendants had a known duty to ensure that Wells Fargo complied with all legal and regulatory requirements, including those imposed by HUD, but they nonetheless caused Wells Fargo to purposely violate HUD reporting requirements by keeping its materially deficient loans a secret.  The Individual Defendants were well aware that HUD regulations required the Company to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations.  This requirement permitted HUD to investigate the bad loans and request reimbursement or indemnification from the Company, as appropriate.  Yet, the Individual Defendants failed to take any action to ensure that Wells Fargo complied with HUD requirements despite knowing that the Company was in violation.

5.     The Individual Defendants were aware of Wells Fargo's improper FHA loan origination and related reporting practices, and violations of HUD requirements, as a result of both internal reviews and government investigations.  The internal reports circulated by the Company's Quality Assurance ("QA") and Fraud Risk Management ("FRM") departments revealed violation rates (up to 48%) that far exceeded the Company's stated benchmark violation rate (5%).  At the same time these internal reviews were revealing Wells Fargo's massive violation rates, the Office of Inspector General ("OIG") was auditing the Company's FHA loan origination practices and issuing reports indicating that (among other things) the Company did not take appropriate action to ensure adherence to HUD requirements when originating FHA loans and submitting them for insurance endorsement.  The members of the Wells Fargo Board of Directors (the "Board") were also made aware of the staggering violation rates in the Company's FHA loan portfolio through (among other things) reports from the internal risk analysis and review staff and the Board's simultaneous internal investigation into the Company's lending practices.  In addition, the members of the Audit and Examination Committee: (i)

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1  reviewed with management and Wells Fargo's General Counsel correspondence between the

2  Company and the OIG and HUD and correspondence between the Company and HUD regarding

3  self-reporting regulations; (ii) reviewed internal reports and management actions to address

4  issues related to compliance with Company policies, including internal reports regarding the

5  Company's compliance (or non-compliance) with HUD's self-reporting regulations; and (iii)

6  affirmatively determined, in the face of the above, that the Company's non-compliance with

7  applicable legal and regulatory requirements was appropriate.   The members of the Credit

8  Committee similarly reviewed and were intimately aware of the significant issues with the

9  Company's FHA loan origination practices (including the astounding violation rates) and the

10 Company's failure to comply with HUD regulations.  Yet, like their fellow Board members, the

11 Audit and Examination Committee and Credit Committee members consciously failed to act in

12 the face of these known violations by the Company, in breach of their fiduciary duty of loyalty.

13      6.    When the U.S. Government learned about the Company's actions, it acted to

14 recoup its losses.  The Company now faces hundreds of millions of dollars in civil liability

15 arising from a lawsuit filed by the United States Attorney's Office for the Southern District of

16 New York.  In particular, the United States seeks to recover treble damages and civil penalties

17 under the False Claims Act, civil penalties under the Financial Institutions Reform, Recovery,

18 and Enforcement Act of 1989, and common-law damages arising from the fraud on  HUD in

19 connection with Wells Fargo's residential mortgage lending business.

20      7.    Plaintiff brings this action against the Individual Defendants to repair the harm

21 that they caused with their faithless actions.

22                **JURISDICTION AND VENUE**

23      8.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the

24 parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

25      9.    This Court has jurisdiction over each defendant named herein because each

26 defendant is either a corporation that conducts business in and maintains operations in this

27 District, or is an individual who has sufficient minimum contacts with this District to render the

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1  exercise of jurisdiction by the District courts permissible under traditional notions of fair play

2  and substantial justice.

3        10.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i)

4  Wells Fargo maintains its principal place of business in this District; (ii) one or more of the

5  defendants either resides in or maintains executive offices in this District; (iii) a substantial

6  portion of the transactions and wrongs complained of herein, including the defendants' primary

7  participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in

8  violation of fiduciary duties owed to Wells Fargo, occurred in this District; and (iv) defendants

9  have received substantial compensation in this District by doing business here and engaging in

10  numerous activities that had an effect in this District.

11                **INTRADISTRICT ASSIGNMENT**

12        11.     A substantial portion of the transactions and wrongdoings which give rise to the

13  claims in this action occurred in the County of San Francisco, and as such, this action is properly

14  assigned to the San Francisco division of this Court.

15                    **THE PARTIES**

16  **Plaintiff**

17        12.     Plaintiff Richard Gulbrandsen is a shareholder of Wells Fargo and has

18  continuously held stock since October 2002.  Plaintiff is a citizen of Illinois.

19  **Nominal Defendant**

20        13.     Nominal Defendant Wells Fargo is a Delaware corporation and a financial

21  services company that provides banking, insurance, investments, mortgage, and consumer and

22  commercial finance internationally and throughout North America.  Wells Fargo is designated as

23  a Direct Endorsement Lender by HUD.[1]  Wells Fargo is the parent company of Wells Fargo

24

25  [1] Direct Endorsement Lender designation is given by HUD to mortgage lenders who are required
to abide by strict guidelines and quality control standards put in place by HUD.  In addition to
having the Direct Endorsement Lender status, the mortgage company will also have the ability to

26  not only approve or deny mortgage applications in its sole discretion, but also be able to fund the

27  mortgage loans it has approved.

28                   - 4 -

1  Home Mortgage.  Wells Fargo's principal executive offices are located at 420 Montgomery

2  Street, San Francisco, California.  Thus, Wells Fargo is a citizen of both Delaware and

3  California.

4  **Defendants**

5      14.    Defendant John G. Stumpf ("Stumpf") is Wells Fargo's Chief Executive Officer

6  ("CEO") and has been since June 2007; President and has been since August 2005; Chairman of

7  the Board of Directors ("Board") and has been since January 2010; and a director and has been

8  since June 2006.  Defendant Stumpf was also Wells Fargo's Chief Operating Officer from

9  August 2005 to June 2007 and Group Executive Vice President, Community Banking from July

10 2002 to August 2005.  Defendant Stumpf has served in various other positions at Wells Fargo

11 and its predecessor since joining the Company in 1982.  Defendant Stumpf knowingly,

12 recklessly, or with gross negligence: (i) caused the Company to engage in improper business

13 practices in connection with the origination, underwriting, and reporting of residential mortgage

14 loans; and (ii) reviewed and approved improper statements regarding the purported quality of the

15 Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Stumpf the

16 following compensation as an executive:

17

| Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | Securities Underlying Options | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | $2,800,000 | - | - | $12,000,026 | - | $3,100,000 | $1,928,295 | - | $14,700 | $19,843,021 |
| 2010 | $3,239,847 | - | - | $11,000,009 | - | $3,300,000 | $1,405,335 | - | $28,531 | $18,973,722 |
| 2009 | $5,600,000 | - | - | $13,083,386 | - | - | $2,584,375 | - | $72,786 | $21,340,547 |
| 2008 | $878,920 | - | - | - | $7,920,000 | - | - | - | $242,167 | $9,041,087 |
| 2007 | $749,615 | - | - | - | $6,061,488 | $4,200,000 | $3,349,498 | - | $436,857 | $14,797,458 |
| 2006 | $700,000 | - | - | $56,736 | $3,057,718 | $5,500,000 | $2,055,327 | - | $385,691 | $11,755,472 |
| 2005 | $600,000 | $4,000,000 | $68,422 | - | - | - | - | 539,378 | $178,500 | $4,846,922 |
| 2004 | $470,833 | $2,375,000 | $100,538 | - | - | - | - | 313,254 | $142,152 | $3,088,523 |
| 2003 | $450,000 | $1,900,000 | $184,284 | - | - | - | - | 275,470 | $148,500 | $2,682,784 |
| 2002 | $420,833 | $2,025,000 | $460,290 | $500,018 | - | - | - | 196,670 | $58,850 | $3,464,991 |
| 2001 | $400,000 | $560,000 | $205,180 | - | - | - | - | 134,340 | $88,800 | $1,253,980 |

22 Defendant Stumpf is a citizen of California.

23      15.    Defendant Cynthia H. Milligan ("Milligan") is a Wells Fargo director and has

24 been since 1992.  Defendant Milligan is also Chairman of Wells Fargo's Credit Committee and

25 has been since at least 2010 and a member of that committee and has been since at least 2007.

26 Defendant Milligan was also a member of Wells Fargo's Audit and Examination Committee

27 from at least March 2001 to at least July 2011.  Defendant Milligan knowingly or recklessly: (i)

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Milligan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2011 | $199,000 | $140,025 | $18,303 | $357,328 |
| 2010 | $138,000 | $70,006 | $119,095 | $327,101 |
| 2009 | $143,455 | $70,011 | $106,778 | $320,244 |
| 2008 | $137,000 | $70,009 | $45,422 | $252,431 |
| 2007 | $121,000 | $70,021 | $29,946 | $220,967 |
| 2006 | $103,400 | $65,035 | $31,060 | $199,495 |

Defendant Milligan is a citizen of Nebraska.

16.     Defendant Philip J. Quigley ("Quigley") was a Wells Fargo director from 1994 to April 2013.  Defendant Quigley was also Wells Fargo's Lead Director from January 2009 to December 2011.  Defendant Quigley was a member of Wells Fargo's Audit and Examination Committee from at least March 2001 to April 2013 and was Chairman of that committee from at least March 2001 to at least March 2008.  Defendant Quigley was also a member of the Company's Credit Committee from at least 2001 to 2008 and again from 2012 to 2013.  Defendant Quigley knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Quigley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2011 | $188,000 | $140,025 | $18,117 | $346,142 |
| 2010 | $160,000 | $70,006 | $118,833 | $348,839 |
| 2009 | $167,000 | $70,011 | $106,778 | $343,789 |
| 2008 | $167,000 | $70,009 | $45,422 | $282,431 |
| 2007 | $160,000 | $70,021 | $29,946 | $259,967 |
| 2006 | $149,200 | $65,035 | $31,060 | $245,295 |

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1  Defendant Quigley is a citizen of California.

2        17.     Defendant Susan G. Swenson ("Swenson") is a Wells Fargo director and has been

3  since 1994.  Defendant Swenson is also a member of Wells Fargo's Audit and Examination

4  Committee and has been since at least March 2001, and was a member of the Credit Committee

5  from 2001 to 2008.  Defendant Swenson knowingly or recklessly: (i) allowed the Company to

6  engage in improper business practices in connection with the origination, underwriting, and

7  reporting of residential mortgage loans; and (ii) reviewed and approved improper statements

8  regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells

9  Fargo paid defendant Swenson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $125,000 | $140,025 | - | $265,025 |
| 2010 | $113,000 | $70,006 | $194,211 | $377,217 |
| 2009 | $129,000 | $70,011 | $106,778 | $305,789 |
| 2008 | $137,000 | $70,009 | $45,422 | $252,431 |
| 2007 | $123,000 | $70,021 | $29,946 | $222,967 |
| 2006 | $106,600 | $65,035 | $31,060 | $202,695 |

15  Defendant Swenson is a citizen of California.

16        18.     Defendant Judith M. Runstad ("Runstad") is a Wells Fargo director and has been

17  since 1998.  Defendant Runstad is also a member of Wells Fargo's Credit Committee and has

18  been since at least 2007, and was a member of the Audit and Examination Committee from at

19  least March 2001 to at least March 2006.  Defendant Runstad knowingly or recklessly: (i)

20  allowed the Company to engage in improper business practices in connection with the

21  origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and

22  approved improper statements regarding the purported quality of the Company's residential

23  mortgage loans to HUD.  Wells Fargo paid defendant Runstad the following compensation as a

24  director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $143,000 | $140,025 | $18,303 | $301,328 |
| 2010 | $105,000 | $70,006 | $118,913 | $293,919 |
| 2009 | $117,000 | $70,011 | $106,778 | $293,789 |
| 2008 | $123,000 | $70,009 | $45,422 | $238,431 |

- 7 -

| | | | |
|---|---|---|---|
| 2007 | $101,000 | $70,021 | $29,946 | $200,967 |
| 2006 | $92,200 | $65,035 | $31,060 | $188,295 |

Defendant Runstad is a citizen of Washington.

19.     Defendant Enrique Hernandez, Jr. ("Hernandez") is a Wells Fargo director and has been since January 2003.  Defendant Hernandez is also a member of Wells Fargo's Audit and Examination Committee and has been since at least March 2003.   Defendant Hernandez knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Hernandez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $166,000 | $140,025 | - | $306,025 |
| 2010 | $128,000 | $70,006 | $106,661 | $304,667 |
| 2009 | $150,000 | $70,011 | $106,778 | $326,789 |
| 2008 | $154,250 | $70,009 | $45,422 | $269,681 |
| 2007 | $117,000 | $70,021 | $29,946 | $216,967 |
| 2006 | $95,400 | $65,035 | $31,060 | $191,495 |

Defendant Hernandez is a citizen of California.

20.     Defendant Lloyd H. Dean ("Dean") is a Wells Fargo director and has been since June 2005.  Defendant Dean was also a member of Wells Fargo's Audit and Examination Committee from at least March 2006 to at least July 2011 and a member of the Credit Committee from at least 2009 to 2012.  Defendant Dean knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Dean the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $166,000 | $140,025 | - | $306,025 |
| 2010 | $121,000 | $70,006 | $106,661 | $297,667 |
| 2009 | $157,000 | $70,011 | $106,778 | $333,789 |

- 8 -

|      |          |          |          |          |
|------|----------|----------|----------|----------|
| 2008 | $135,000 | $70,009  | $45,422  | $250,431 |
| 2007 | $129,000 | $70,021  | $29,946  | $228,967 |
| 2006 | $109,800 | $65,035  | $31,060  | $205,895 |

Defendant Dean is a citizen of California.

21.     Defendant Nicholas G. Moore ("Moore") was a Wells Fargo director from February 2006 to April 2013.  Defendant Moore was also Chairman of Wells Fargo's Audit and Examination Committee from at least March 2009 to March 2013 and a member of that committee from at least March 2007 to at least March 2013.  Defendant Moore was also a member of the Credit Committee from at least 2009 to 2013.  Defendant Moore knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Moore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2011 | $163,000 | $140,025 | -        | $303,025 |
| 2010 | $151,000 | $70,006  | $106,661 | $327,667 |
| 2009 | $183,000 | $70,011  | $106,778 | $359,789 |
| 2008 | $139,000 | $70,009  | $45,422  | $254,431 |
| 2007 | $115,000 | $70,021  | $29,946  | $214,967 |
| 2006 | $81,983  | $97,520  | $35,850  | $215,353 |

Defendant Moore is a citizen of California.

22.     Defendant John D. Baker II ("Baker") is a Wells Fargo director and has been since January 2009.  Defendant Baker is also a member of Wells Fargo's Audit and Examination Committee and its Credit Committee and has been since January 2009.  Defendant Baker knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Baker the following compensation as a director:

| Fiscal | Fees Paid in Cash | Stock Awards | Option | Total |
|--------|-------------------|--------------|--------|-------|

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

| Year | | | Awards | |
|---|---|---|---|---|
| 2011 | $151,000 | $140,025 | - | $291,025 |
| 2010 | $119,000 | $70,006 | $106,661 | $295,667 |
| 2009 | $155,000 | $93,351 | $125,388 | $373,739 |

Defendant Baker is a citizen of Florida.

23.    Defendant Susan E. Engel ("Engel") is a Wells Fargo director and has been since 1998.  Defendant Engel is a member of Wells Fargo's Credit Committee and has been since at least 2001.  Defendant Engel knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Engel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $143,000 | $140,025 | $18,117 | $301,142 |
| 2010 | $117,000 | $70,006 | $106,661 | $293,667 |
| 2009 | $131,000 | $70,011 | $106,778 | $307,789 |
| 2008 | $133,000 | $70,009 | $45,422 | $248,431 |
| 2007 | $109,000 | $70,021 | $29,946 | $208,967 |
| 2006 | $93,800 | $65,035 | $31,060 | $189,895 |

Defendant Engel is a citizen of New York.

24.    Defendant Stephen W. Sanger ("Sanger") is Wells Fargo's Lead Director and has been since January 2012 and a director and has been since July 2003.  Defendant Sanger knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Sanger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $148,000 | $140,025 | - | $288,025 |
| 2010 | $129,000 | $70,006 | $106,661 | $305,667 |
| 2009 | $141,000 | $70,011 | $106,778 | $317,789 |
| 2008 | $149,000 | $70,009 | $45,422 | $264,431 |
| 2007 | $123,000 | $70,021 | $29,946 | $222,967 |

| | | | | |
|---|---|---|---|---|
| 2006 | $100,733 | $65,035 | $31,060 | $196,828 |

Defendant Sanger is a citizen of Minnesota.

25.    Defendant John S. Chen ("Chen") is a Wells Fargo director and has been since September 2006.  Defendant Chen knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Chen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $111,000 | $140,025 | - | $251,025 |
| 2010 | $99,000 | $70,006 | $106,661 | $275,667 |
| 2009 | $113,000 | $70,011 | $106,778 | $289,789 |
| 2008 | $111,000 | $70,009 | $45,422 | $226,431 |
| 2007 | $91,000 | $70,021 | $37,879 | $198,900 |
| 2006 | $26,467 | $65,016 | $9,066 | $100,549 |

Defendant Chen is a citizen of California.

26.    Defendant Donald M. James ("James") is a Wells Fargo director and has been since January 2009.  Defendant James knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant James the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $119,000 | $140,025 | - | $259,025 |
| 2010 | $109,000 | $70,006 | $106,661 | $285,667 |
| 2009 | $123,000 | $93,351 | $125,388 | $341,739 |

Defendant James is a citizen of Alabama.

27.    Defendant Richard M. Kovacevich ("Kovacevich") was Wells Fargo's CEO from November 1998 to June 2007; Chairman of the Board from April 2001 to December 2009; a director from 1986 to December 2009; and President from November 1998 to August 2005.

Defendant Kovacevich knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Kovacevich the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | Securities Underlying Options | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2008 | $992,955 | - | - | $2,283,333 | - | $223,028 | - | $250,540 | $3,749,856 |
| 2007 | $995,000 | - | - | $11,211,155 | $5,700,000 | $4,364,258 | - | $604,539 | $22,874,952 |
| 2006 | $995,000 | - | - | $16,826,148 | $8,500,000 | $2,982,214 | - | $543,521 | $29,846,883 |
| 2005 | $995,000 | $7,000,000 | $57,809 | - | - | - | 1,009,596 | $509,700 | $8,562,509 |
| 2004 | $995,000 | $7,500,000 | $259,342 | - | - | - | 1,853,306 | $509,602 | $9,263,944 |
| 2003 | $995,000 | $7,500,000 | $102,661 | - | - | - | 865,740 | $479,700 | $9,077,361 |
| 2002 | $995,000 | $7,000,000 | $96,389 | - | - | - | 865,330 | $203,700 | $8,295,089 |
| 2001 | $995,000 | $2,400,000 | $78,579 | - | - | - | 1,128,012 | $388,200 | $3,861,779 |

Defendant Kovacevich is a citizen of California.

28.     Defendant Howard I. Atkins ("Atkins") was Wells Fargo's Chief Financial Officer from August 2001 to February 2011; a Senior Executive Vice President from August 2005 to February 2011; and an Executive Vice President from August 2001 to August 2005.  Defendant Atkins knowingly, recklessly, or with gross negligence: (i) caused the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Atkins the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | Securities Underlying Options | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | $176,538 | - | - | - | $462,482 | - | $83,133 | - | $14,700 | $736,853 |
| 2010 | $1,957,492 | - | - | $5,500,018 | $77,300 | $1,700,000 | $77,138 | - | $14,700 | $9,326,648 |
| 2009 | $3,339,156 | - | - | $6,811,260 | $1,297,622 | - | $118,425 | - | $56,848 | $11,623,311 |
| 2008 | $598,767 | - | - | - | $4,149,384 | - | $67,057 | - | $130,974 | $4,946,182 |
| 2007 | $600,000 | - | - | - | $2,684,073 | $2,000,000 | $138,999 | - | $251,663 | $5,674,735 |
| 2006 | $600,000 | - | - | $116,669 | $1,119,091 | $3,000,000 | $202,576 | - | $250,947 | $5,289,283 |
| 2005 | $570,833 | $3,000,000 | $8,624 | - | - | - | - | 304,169 | $166,250 | $3,745,707 |
| 2004 | $550,000 | $2,200,000 | $266,247 | - | - | - | - | 171,960 | $163,086 | $3,179,333 |
| 2003 | $550,000 | $2,200,000 | $148,902 | - | - | - | - | 196,760 | $132,000 | $3,030,902 |
| 2002 | $550,000 | $1,650,000 | $255,836 | - | - | - | - | - | - | $2,455,836 |
| 2001 | $222,917 | $412,500 | $50,967 | $5,000,110 | - | - | - | 253,100 | - | $5,686,494 |

Defendant Atkins is a citizen of California.

- 12 -

29.     Defendant J.A. Blanchard, III ("Blanchard") was a Wells Fargo director from 1996 to April 2006.  Defendant Blanchard was also a member of Wells Fargo's Audit and Examination Committee and Credit Committee from at least March 2001 to April 2006.  Defendant Blanchard knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Blanchard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2006 | $42,467 | $42,467 |

Defendant Blanchard is a citizen of Minnesota.

30.     Defendant Reatha Clark King ("King") was a Wells Fargo and director from 1986 to April 2006.  Defendant King was also a member of Wells Fargo's Audit and Examination Committee from at least March 2001 to April 2006 and a member of the Company's Credit Committee in 2001.  Defendant King knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant King the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2006 | $37,667 | $37,667 |

Defendant King is a citizen of Minnesota.

31.     Defendant Robert L. Joss ("Joss") was a Wells Fargo director from 1999 to July 2009.  Defendant Joss was also a member of Wells Fargo's Audit and Examination Committee from at least March 2007 to at least March 2009 and the Company's Credit Committee from at least 2001 to 2009 (including as Credit Committee Chairman from 2003 to 2009).  Defendant Joss knowingly or recklessly: (i) allowed the Company to engage in improper business practices

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Joss the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2009 | $90,671 | $70,011 | $106,778 | $267,460 |
| 2008 | $158,000 | $70,009 | $45,422 | $273,431 |
| 2007 | $150,000 | $70,021 | $29,946 | $249,967 |
| 2006 | $132,800 | $65,035 | $31,060 | $228,895 |

Defendant Joss is a citizen of California.

32.    Defendant Richard D. McCormick ("McCormick") was a Wells Fargo director from 1983 to May 2011.  Defendant McCormick knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant McCormick the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $55,250 | - | - | $55,250 |
| 2010 | $107,000 | $70,006 | $106,661 | $283,667 |
| 2009 | $121,000 | $70,011 | $106,778 | $297,789 |
| 2008 | $130,750 | $70,009 | $45,422 | $246,181 |
| 2007 | $118,000 | $70,021 | $29,946 | $217,967 |
| 2006 | $97,600 | $65,035 | $31,060 | $193,695 |

Defendant McCormick is a citizen of Colorado.

33.    Defendant Michael W. Wright ("Wright") was a Wells Fargo director from 1991 to April 2009.  Defendant Wright was also a member of Wells Fargo's Credit Committee from at least 2001 to 2009.  Defendant Wright knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Wright the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2009 | $47,000 | - | - | $47,000 |
| 2008 | $125,000 | $70,009 | $45,422 | $240,431 |
| 2007 | $105,000 | $70,021 | $29,946 | $204,967 |
| 2006 | $95,667 | $65,035 | $31,060 | $191,762 |

Defendant Wright is a citizen of Florida.

34.     Defendant Donald B. Rice ("Rice") was a Wells Fargo director from 1993 to April 2010 and from 1980 to 1989.  Defendant Rice knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Rice the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $41,000 | - | - | $41,000 |
| 2009 | $124,000 | $70,011 | $106,778 | $300,789 |
| 2008 | $134,000 | $70,009 | $45,422 | $249,431 |
| 2007 | $118,000 | $70,021 | $29,946 | $217,967 |
| 2006 | $104,000 | $65,035 | $31,060 | $200,095 |

Defendant Rice is a citizen of California.

35.     Defendant Benjamin F. Montoya ("Montoya") was a Wells Fargo director from 1996 to April 2004.  Defendant Montoya was also a member of Wells Fargo's Audit and Examination Committee from at least March 2001 to at least March 2004.  Defendant Montoya knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Defendant Montoya is a citizen of California.

36.     Defendant Robert K. Steel ("Steel") was a Wells Fargo director from January 2009 to July 2010.  Defendant Steel was a member of Wells Fargo's Credit Committee from

- 15 -

2009 to 2010.  Defendant Steel knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant Steel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $63,750 | $70,006 | $106,661 | $240,417 |
| 2009 | $117,000 | $93,351 | $125,388 | $335,739 |

Defendant Steel is a citizen of Connecticut.

37.    Defendant Mackey J. McDonald ("McDonald") was a Wells Fargo director from January 2009 to April 2012.  Defendant McDonald knowingly or recklessly: (i) allowed the Company to engage in improper business practices in connection with the origination, underwriting, and reporting of residential mortgage loans; and (ii) reviewed and approved improper statements regarding the purported quality of the Company's residential mortgage loans to HUD.  Wells Fargo paid defendant McDonald the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $115,000 | $140,025 | - | $255,025 |
| 2010 | $105,000 | $70,006 | $106,661 | $281,667 |
| 2009 | $121,000 | $93,351 | $125,388 | $339,739 |

Defendant McDonald is a citizen of North Carolina.

38.    The defendants identified in ¶¶14, 27-28 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14-27, 29-37 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15-22, 29-31 are referred to herein as the "Audit and Examination Committee Defendants."  The defendants identified in ¶¶15-18, 20-23, 29-31, 33, 36 are referred to herein as the "Credit Committee Defendants."  Collectively, the defendants identified in ¶¶14-37 are referred to herein as the "Individual Defendants."

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, the Individual Defendants owed and owe Wells Fargo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wells Fargo; in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wells Fargo and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.     Each officer and director of the Company owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Wells Fargo Team Member Code of Ethics and Business Conduct**

41.     Wells Fargo's Team Member Code of Ethics and Business Conduct provides that employees must comply with all applicable laws in connection with their roles at the Company:

> Wells Fargo's commitment to following federal laws, rules, and regulations, as well as applicable laws, rules, and regulations of all localities, states, and countries where we do business, is not only the right thing to do, it helps maintain and protect our company's reputation. This includes compliance with all applicable securities laws and regulations, accounting standards, accounting controls, and audit practices.
>
> As a team member, you are expected to support this commitment to protect Wells Fargo's reputation and to serve Wells Fargo's best interest by:
>
> - Being knowledgeable about your job.
>
> - Conducting all aspects of Wells Fargo's business and community involvement in an honest, ethical, and legal manner and in accordance with federal laws, rules, and regulations and the applicable laws, rules, and regulations of all localities, states and countries where Wells Fargo does business.

- Complying with Wells Fargo's policies and procedures.

- Recognizing that your professional and personal conduct can positively or negatively affect Wells Fargo's reputation and acting in a responsible way that upholds Wells Fargo's reputation.

**Director Code of Ethics**

42.     Wells Fargo's Director Code of Ethics provides that directors "are expected to act in a manner that will serve the best interests of Wells Fargo[,] that is fair, honest and trustworthy[, and] that is in compliance with applicable laws, rules and regulations."

**Corporate Governance Guidelines**

43.     Pursuant to the Company's Corporate Governance Guidelines, directors are expected to attend all scheduled and special Board meetings and meetings of committees on which they serve and to spend the time appropriately to properly discharge their responsibilities. Information and data that are important to the Board's understanding of the business to be conducted at a Board or committee meeting are distributed in writing to the Board before the meeting, and directors review these materials in advance of the meeting.

44.     Board members have complete access to the Company's management.  The Board and each committee have the authority to obtain advice and assistance from internal and external legal, accounting, or other advisors, at the Company's expense, without consulting with or obtaining the prior approval of management of the Company.

**Audit and Examination Committee Duties**

45.     Under the Audit and Examination Committee Charter in effect since at least February 2000, and updated in 2002, 2004, 2006, 2010, and 2011, the Audit and Examination Committee Defendants.

46.     According to its Charter, the purpose of the Audit and Examination Committee is to assist the Board in fulfilling its responsibilities to oversee Company policies and management activities related to accounting and financial reporting, internal controls, auditing, operational risk and legal and regulatory compliance.  In fulfilling its oversight role, the Audit and Examination Committee provides a vehicle for communication between the directors and the

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

outside auditors, the internal auditors, financial management, and the Compliance and Enterprise Risk Management Group, and establishes a forum for an open exchange of views and information.  The Audit and Examination Committee Defendants were and are tasked with reviewing "the enterprise-wide compliance risk management program, the general condition of compliance in the Company, common issues across business lines, significant violations of statutes and regulations … with corrective actions and schedules for resolution, the reputation risks of significant compliance exposures and other high-risk concerns."

47.     Pursuant to the Audit and Examination Committee Charter, during the relevant time period, the Audit and Examination Committee Defendants were required to, among other things: (i) *review with management and the outside auditors correspondence with regulators or governmental agencies*; (ii) *review internal reports and management actions* to address issues related to compliance with Company policies, including the Code of Ethics and Business Conduct; (iii) *determine that appropriate actions have been taken to resolve matters reported to the Committee* that could materially jeopardize the Company's financial condition, such as *non-compliance with federal and state laws and legal actions*; (iv) at least annually, obtain and review a report by the outside auditors describing (among other things) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; (v) *review with the Company's General Counsel legal matters* that may have a material impact on the financial statements, *the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies*; and (vi) meet at least annually with the Chief Financial Officer, the Chief Auditor, and the outside auditors in separate executive sessions.

The Audit and Examination Committee was active during the wrongdoing alleged herein, meeting four times in 2001; seven times in 2002; eight times in 2003 -2005; twelve times in 2006; eleven times in 2007; ten times in 2008 and 2009; and nine times in 2010 and 2011.

- 19 -

During these years, the Audit and Examination Committee helped shape the path of the Company by tacitly approving certain improper behavior of management and encouraging short term goals and objectives in a way that was detrimental to the Company in the long term.

**Credit Committee Duties**

48.    Under the Credit Committee, the Credit Committee Defendants owed and owe specific duties to Wells Fargo.

49.    The express purposes of the Credit Committee are to, on behalf of the Board: (i) review the quality of the Company's credit portfolio and the trends affecting that portfolio; (ii) oversee the effectiveness and administration of credit-related policies; (iii) review the adequacy of the allowance for credit losses; and (iv) report to the Board (including the members of the Audit Committee) regarding these matters.

50.    The Credit Committee is and was required to, among other things: (i) monitor the performance and quality of the Company's credit portfolio through the review of selected measures of credit quality and trends and such other information as it deems appropriate, including criticized/classified and nonperforming assets, consumer loan delinquencies, and net charge-offs; (ii) oversee the administration and effectiveness of, and compliance with, the Company's credit policies through the review of such processes, reports, and other information as it deems appropriate, including the loan-quality grading and examination process, internal and external audits, and examinations of the Company's credit processes, the incidence of new problem assets, and the frequency, and reasons for credit policy exceptions; (iii) review and assess the adequacy of the allowance for credit losses; and (iv) review and approve such of the Company's credit-related activities as may be required by applicable law, including annual reviews of the credit quality plan for the coming year, international country exposures, and real estate lending policies.

51.    The Credit Committee met three times per year from 2001-2007 and four times per year from 2008-2011.

**Control, Access, and Authority**

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

52.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Wells Fargo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

53.     Because of their advisory, executive, managerial, and directorial positions with Wells Fargo, each Individual Defendant had access to adverse, non-public information about the Company's mortgage loans.

54.     At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants and of Wells Fargo, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

55.     To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

**Breach of Duties**

56.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Wells Fargo, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Wells Fargo's Board during the time of the misconduct.

57.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that perpetrated a fraud on the Government, and caused Wells Fargo to incur substantial damage.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, Wells Fargo has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that: (i) deceived and exploited the Government into paying for defaults on loans that the Company knew were deficient; and (ii) enhanced their

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1   executive and directorial positions at Wells Fargo and the profits, power, and prestige that they
2   enjoyed as a result of holding these positions.  The Individual Defendants, collectively and
3   individually, took the actions set forth herein.

4        60.    The purpose and effect of the Individual Defendants' conspiracy, common
5   enterprise, and/or common course of conduct was, among other things, to disguise the Individual
6   Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust
7   enrichment; and to conceal adverse information concerning the Company's operations.

8        61.    The Individual Defendants accomplished their conspiracy, common enterprise,
9   and/or common course of conduct by causing the Company to purposefully or recklessly mislead
10  the Government regarding the quality of its residential mortgage loans.  Because the actions
11  described herein occurred under the authority of the Board, each of the Individual Defendants
12  was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or
13  common course of conduct complained of herein.

14       62.    Each of the Individual Defendants aided and abetted and rendered substantial
15  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the
16  commission of the wrongdoing complained of herein, each Individual Defendant acted with
17  knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that
18  wrongdoing, and was aware of his or her overall contribution to and furtherance of the
19  wrongdoing.

20                          **SUBSTANTIVE ALLEGATIONS**
21  **The FHA Mortgage Insurance Program**

22       63.    FHA, a part of HUD, is the largest mortgage insurer in the world, insuring
23  approximately one-third of all new residential mortgages in the United States.  Pursuant to the
24  National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through
25  these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans
26  made to buyers of single-family housing.  The programs help low-income and moderate-income
27  families become homeowners by encouraging mortgage lenders to make loans to creditworthy

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1   borrowers who nevertheless might not meet conventional underwriting requirements.  In the

2   event that a borrower defaults on an FHA-insured mortgage, the lender or other party holding the

3   mortgage submits a claim to HUD for the costs associated with the defaulted mortgage and the

4   sale of the property.  HUD then pays off the balance of the mortgage and other related costs and

5   may assume ownership of the property.

6          64.     HUD relies on each individual loan certification to endorse the loan and provide

7   the lender with an FHA mortgage insurance certificate.  Once a loan is endorsed for insurance,

8   the loan receives a unique FHA case number.  In the event that HUD later discovers that a loan

9   was endorsed despite being ineligible for the FHA program, HUD seeks indemnification from

10  the Direct Endorsement Lender that certified the loan via an indemnification agreement, whereby

11  the lender agrees to indemnify HUD should claims for FHA insurance be submitted on that loan.

12         65.     Whenever an FHA loan defaults and an insurance claim is submitted for

13  processing through HUD's electronic claim system, the claim must include the FHA case number

14  as well as the FHA mortgagee identifying number of the lender inputting the claim, which must

15  be either the holder of record or the servicer of record of the mortgage.  If a valid FHA case

16  number is not submitted with the claim, an insurance payment will not be processed on that

17  claim.

18         66.     After a claim is submitted, HUD's electronic system will automatically conduct a

19  series of edits to ensure data validity, date consistency, and that reasonable and valid amounts are

20  requested for reimbursement, including that the FHA insurance for the case number provided is

21  in "Active" status and there are no other impediments (such as a no-pay flag or indemnification

22  agreement) to paying the claim. After a claim has passed all the electronic edits in the claim

23  processing system, the claim is approved for payment and a disbursement request is sent to the

24  United States Treasury to issue the funds via wire transfer to the holder of record.  However,

25  where a lender and HUD have entered into an indemnification agreement with respect to a

26  particular loan, and an insurance claim is submitted with respect to that loan, if the holder of

27  record to which claim proceeds would be disbursed is also the indemnifying lender, the

28

- 24 -

1   electronic claim system will not process payment of the claim. But, if the holder of record is not

2   the lender that indemnified HUD for the loan, HUD will disburse payment to the holder of

3   record and then issue a billing letter to the indemnifying lender to recoup HUD's losses.

4       67.    HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage

5   programs. A Direct Endorsement Lender is authorized to underwrite mortgage loans, decide

6   whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA

7   mortgage insurance without prior HUD review or approva1. To qualify for FHA mortgage

8   insurance, a mortgage must meet all of the applicable HUD requirements (e.g., income, credit

9   history, valuation of property, etc.).

10       68.    HUD relies on the expertise and knowledge of Direct Endorsement Lenders in

11   providing FHA insurance. A Direct Endorsement Lender is, therefore, obligated to act with the

12   utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD. The

13   duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to

14   HUD of all material facts and to take on the affirmative duty of employing reasonable care to

15   avoid misleading HUD in all circumstances.

16   **Underwriting and Due Diligence Requirements**

17       69.    A Direct Endorsement Lender is responsible for all aspects of the mortgage

18   application, the property analysis, and the underwriting of the mortgage. The underwriter must

19   "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the

20   periodic payments under the mortgage and all other obligations, and the adequacy of the

21   mortgagor's available assets to close the transaction, and render an underwriting decision in

22   accordance with applicable regulations, policies and procedures." 24 C.F.R. §203.5(d).

23   Mortgagees must employ underwriters who can detect warning signs that may indicate

24   irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions

25   are performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶2-

26   4(C)(5); *see also* HUD Handbook 4155.2 ¶2.A.4.b. The lender must also maintain a compliant

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.  HUD Handbook 4060.1 REV-2, ¶2-9(A).

70.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.  The purposes of due diligence include: (i) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R. §203.5(d); and (ii) examining a property offered as security for the loan to determine if it provides sufficient collateral, *see* 24 C.F.R. §203.5(e)(3).  Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."  24 C.F.R. §203.5(c).

71.     HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders.  These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.  With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans), to evaluate a borrower's credit.  The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.  HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

72.     To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts, and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any factors permitting deviations from those fixed ratios.

73.     With respect to appraising the mortgaged property (i.e., collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD Handbook 4150.2 (Valuation Analysis for Single Family One- to Four-Unit Dwellings).  The rules set forth in HUD Handbook 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

**Quality Control Requirements**

74.     Furthermore, to maintain HUD and FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program.  HUD requires the quality control department to be independent of mortgage origination and servicing functions. *See* HUD Handbook 4060.1 REV-1, ¶6-3(B); HUD Handbook 4060.1 REV-2, ¶7-3(B); HUD Handbook 4700.2 REV-1, ¶6-1(A).  To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (i) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (ii) conduct a full review of "all loans going into default within the first six payments," which HUD defines as "Early Payment Defaults."  HUD Handbook 4060.1 REV-1, ¶¶6-6(C), 6-6(D); HUD Handbook 4060.1 REV-2, ¶¶7-6(C), 7-6(D); HUD Handbook 4700.2 REV-1, ¶¶6-1(B), 6-1(D).

75.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information.  For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written re-verification.  Examples of items that must be re-verified include, but are not limited to, the mortgagor's

employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."   HUD Handbook 4060.1 REV-2, ¶7-6(E)(2).   Further, "[a]ny discrepancies must be explored to ensure that the original documents ... were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." *Id*.; *see also* HUD Handbook 4060.1 REV-1, ¶6-6(E)(2); HUD Handbook 4700.2 REV-1, ¶6-3(A)(2).

76.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review.  The system should enable a mortgagee to compare one month's sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1 REV-2, ¶7-4; *see also* HUD Handbook 4060.1 REV-1, ¶6-4.   The ratings provided, for this purpose, are "Low", i.e., no or minor violations, "Acceptable," i.e., issues identified were not material to insurability of the loan, "Moderate," i.e., significant unresolved questions or missing documentation created a moderate risk to the mortgagee and FHA, and "Material," i.e., issues identified were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk, such that the loans must be reported to HUD.  HUD Handbook 4060.1 REV-1, ¶6-4; HUD Handbook 4060.1 REV-2, ¶7-4.

77.     Specifically, the HUD Handbook defines "Material Risk" loans as follows:

> The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk. For example, a significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud. Mortgagees must report these loans, in writing, to the Quality Assurance Division in the FHA Home Ownership Center having jurisdiction.

HUD Handbook 4060.1 REV-2, ¶7-4(D); *see also* HUD Handbook 4060.1 REV-1, ¶6-4(D).

78.     Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of noncompliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within sixty days of the initial discovery.  HUD Handbook 4060.1

REV-1, CHG-l, ¶¶6-13, 6-3(J); *see also* HUD Handbook 4060.1 REV-2, ¶7-3(J) (requiring Direct Endorsement Lenders to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").  Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

79.    Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of noncompliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction.  In May 2005, HUD issued Mortgagee Letter 2005-26, which notified lenders that going forward they would have to participate in mandatory electronic reporting through HUD's online Neighborhood Watch system.  That new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various individual HOCs.

80.    In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings.  In particular, quality control review findings must "***be reported to the mortgagee's senior management within one month of completion of the initial report***" and "[m]anagement must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities." HUD Handbook 4060.1 REV-2, ¶7-3(1); *see also* HUD Handbook 4060.1 REV-1, ¶6-3(1); HUD Handbook 4700.2 REV-1, ¶6-1(F).  Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

**Direct Endorsement Lender Certifications**

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

81.     Every Direct Endorsement Lender must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.   The annual certification states:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful annual certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

82.     In addition to the annual certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."   Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by the FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)."   *Id.*   For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage...."   *Id.*   HUD relies on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

**Wells Fargo Submits Thousands of False Individual Loan Certifications to HUD**

83.     Despite specific guidance within the mortgage lending industry, Wells Fargo (at the direction and/or with the tacit approval of the Individual Defendants, as discussed below) engaged in a regular practice of reckless origination and underwriting of its retail FHA loans and falsely certified to HUD that tens of thousands of those loans were eligible for FHA insurance.

- 30 -

84.     Between May 2001 and October 2005, the quality of Wells Fargo's retail FHA loans was extremely poor.  This was a function of the Company's concerted effort to prioritize volume of loans over quality.  The Company was underwriting so many loans that it had to hire temporary staff that it knew would not be adequately trained.  Moreover, the Company vastly increased its FHA loan volume by paying incentive bonuses to underwriters based on the number of loans that they approved.  This led to loan officers and underwriters being pressured to originate and approve as many FHA loans as possible, as quickly as possible.  Not surprisingly, this increase in loan volume came at the expense of loan quality.

85.     From May 2001 through October 2005, a substantial percentage of the Company's retail FHA loan portfolio—nearly 50% in certain months—did not comply with HUD quality requirements, contained an unacceptable level of risk, and, therefore, was ineligible for HUD insurance.  But no effective action was taken to address the seriously deficient loan originations and underwriting.  And to avoid any indemnification claims from the FHA, Wells Fargo concealed the fact that it was having very serious loan quality problems from HUD and failed to self-report, as required, any of the bad loans.  As a result of Wells Fargo's false loan certifications, FHA paid insurance claims on thousands of defaulted mortgage loans that did not meet HUD's requirements and were ineligible for FHA insurance.

86.     The underlying causes of Wells Fargo's loan quality problems and reckless underwriting are multifold.  In or around the middle of 2000, Wells Fargo significantly increased its FHA loan originations.  From January 1, 2001 through December 31, 2002, Wells Fargo originated or sponsored approximately 225,000 FHA loans.  To facilitate this substantial increase in FHA originations, Wells Fargo expanded its staff, including hiring temporary underwriters to review FHA loans.  Many of these employees were not adequately trained with respect to the requirements of the FHA program.

87.     To compound matters, Wells Fargo paid its underwriters bonuses (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed. This improper *de facto* commission incentivized the underwriters to approve as many FHA loans

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

as possible, regardless of the risk of default or the loan's eligibility for FHA insurance.  Worse yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

88.     Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans.  And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

89.     The extraordinarily heavy volume of FHA loans also overwhelmed Wells Fargo's FHA underwriters and further contributed to the extremely poor loan quality.  This heavy volume was particularly problematic given the underwriting staff's general lack of experience.

**Internal Reviews and Government Investigations Reveal Wells Fargo's Reckless Inadequate FHA Loan Origination and Underwriting Practices and Submissions of False Loan Certifications to HUD**

90.     Wells Fargo's home mortgage division's quality control function included both the FRM and QA departments.  The QA department's procedures included the following with respect to FHA-insured loans: monthly reviews of a random sample of loans originated and sponsored within the prior sixty days, reviews of at least some portion of its EPDs, and preparation and circulation of internal reports of the reviews' findings.  The FRM department also reviewed loans referred to it as potentially involving fraud or misrepresentations.  The FRM department had several sources for these referrals, including the QA department, its branches, and the Company's fraud reporting hotline.

91.     In evaluating the loans it reviewed, Wells Fargo tracked HUD Handbook terminology, rating its findings regarding the risks of the loans as either "Material," "Moderate," or "Acceptable."  Wells Fargo's definition for the "Material" rating mirrored HUD's definition in sum and substance, and indicated that a loan with that rating contained unacceptable risk and was ineligible for FHA insurance.  Specifically, Wells Fargo's definition of the "Material" rating in October 2002 was as follows:

> The loan contains significant deviations from the specific loan program parameters under which it was originated, making the loan ineligible for sale to the investor or resulting in potential repurchase or indemnification. [And/or] The loan contains significant risk factors affecting the underwriting decision and/or contains misrepresentation, which may render the loan non-investment quality.

92.     Wells Fargo's May 2004 Quality Control Plan for FHA loans, which was provided to HUD, defined "Material risk" rated loans similarly:

> The loan contains significant deviations from the specific loan program parameters under which it was originated or significant risk factors affecting the underwriting decision and/or contains misrepresentation, making the loan ineligible for sale to the investor or resulting in potential repurchase or indemnification.

The Company's QA Plan also included examples drawn directly from the HUD Handbook's definition of "Material risk" loans, stating: "Examples of material risks include the applicant's capacity to repay the mortgage, failure to underwrite an assumption or protect abandoned property from damage, or fraud."

93.     Both the QA and FRM departments made monthly reports to senior management. In particular, Wells Fargo's QA department provided written reports, summarizing its findings resulting from QA's reviews of statistically random monthly samples of loans, as well as loans that were categorized as early payment defaults ("EPDs").  Among other information, those QA reports summarized the percentage of loans reviewed in various categories and lines of business that contained "Material" risk ratings.

94.     Where FRM received a referral and conducted an initial review of a loan, if the loan file indicated there may have been origination and underwriting violations, FRM performed a "deep dive" review.  In this "deep dive," the FRM reviewers sought to verify the employment and income, whether "middle men" were being used for purchases, the validity of appraisals, and other items.  On the retail side of home mortgage, according to a former Wells Fargo FRM manager, these reviews exposed a "dirty underbelly of bad loan officers."

95.     Through these internal reviews, Wells Fargo's QA division detected the decline in the Company's loan quality and reported these results to senior management.  For example, QA's report for loans originated in December 2000 advised that 26% of the retail FHA loans that were

- 33 -

randomly sampled contained a material violation of HUD's requirements.  In other words, based on Wells Fargo's sampling, greater than one out of every four retail FHA loans that the Company originated in December 2000 and certified to HUD for FHA insurance bore unacceptable risk and did not meet HUD's requirements.  The report for December 2000 originations was consistent with prior monthly QA reports from the summer and fall of 2000 showing material violation rates in randomly sampled retail FHA loans of between about 15% to 20%.

96.     Despite these troubling findings and blatant red flags, no written action plans were prepared for loans with material violations.  Corrective action for such loans was not formally tracked.  There was little to no follow-up on the material violations.  And Wells Fargo failed to self-report any of these loans with serious deficiencies to HUD.  Instead, Wells Fargo continued on the same path, originating tens of thousands of FHA loans with the same reckless underwriting, and certifying its entire portfolio of FHA loans for insurance.

97.     As a result, the material violation rate worsened significantly beginning in May 2001, and escalated throughout 2002.  Based on Wells Fargo's own QA findings, during the twenty-one months from May 2001 through January 2003, the material violation rate for randomly reviewed FHA loans exceeded 25% in eighteen of those months.  That means that at least one out of every four retail FHA loans that Wells Fargo certified to HUD for FHA insurance during those months did not qualify.

98.     Even worse, during a seven-month stretch from April 2002 through October 2002, the material violation rate never dipped below 42%, and reached as high as 48%.  That means that during those months nearly one out of every two retail FHA loans that Wells Fargo certified to HUD did not qualify for insurance.  This was an extraordinary departure from Wells Fargo's internal benchmark for material violations, which was set at 5%.  And QA's material violation rate for FHA loans that went into early payment default was even higher, averaging 66% in 2002 and hitting an astronomical high of nearly 90% in one of those months.

99.     As shown by Wells Fargo's internal QA reports from February 2003 through October 2005, month after month QA reported to management about the significant problems it

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

was finding with respect to the Company's retail FHA loans.  Despite these reports, and QA's increasingly specific direction to management about the very serious underwriting problems, no effective action was taken.  For example, in July 2003, QA candidly advised that one of the "overall root cause[s]" for the exceedingly high material violation rates in underwriting across all business lines was "[v]olume, pressure to approve loans, and the experience levels."  QA was even more explicit in its August 2003 report on the same issue: "heavy volume, pressure to approve loans and meet acceptable turn times along with inexperienced staff are key contributing factors overall to the issues leading to material findings."

100.    Instead of limiting its FHA originations or training an appropriate underwriting staff to match the volume of loans the bank was originating, Wells Fargo slashed the number of its FHA underwriters from 919 to 401.  This smaller crew of underwriters remained inadequately trained, and the Company's improper bonus system for underwriters continued throughout this period.

101.    Consequently, Wells Fargo's QA reports show that the material violation rate for randomly sampled retail FHA loans remained very high, over 20% in many months.  At the same time, the moderate violation rate skyrocketed.  For a number of months during this period, the combined material and moderate violation rate exceeded 80% of the randomly sampled retail FHA loans, hitting a high of 87.2% in July 2003.  And for eighteen consecutive months that combined rate hovered between 70% and 80% and never fell below 63%.  This astoundingly high violation rate - including the moderate violations - was a very serious problem because the "moderate" risk rating classification encompassed underwriting violations that actually were material to whether the loans met HUD's requirements and were eligible for FHA insurance.  The "moderate" rated loans in this and prior periods included loan files that lacked support for critical borrower income and asset information, including missing or incomplete verifications of employment, missing income, asset, and debt documentation, incorrect calculations of income, and social security number discrepancies.  For example, one QA report in this period identified "moderate" and "material" violations as follows: "Critical documentation needed for either loan

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1  decisioning or program requirements are missing ... Examples noted were employment gaps,

2  discrepancies on pay-stubs for hours worked, ytd earnings that don't coincide with current

3  earnings, etc."   Indeed, QA noted that "[i]n many instances the only difference between a

4  moderate or material rating are the loan characteristics.  Therefore, attention should be given to

5  all deficiencies if improved quality is to be achieved and maintained."

6      102.    In addition to the internal reviews, the OIG conducted numerous audits of Wells

7  Fargo's FHA loan origination practices during this time period.  For example, the OIG conducted

8  an audit of Wells Fargo from August 28, 2003 to May 14, 2004.  The OIG selected Wells Fargo

9  for this audit because "Wells Fargo is the leading lender of FHA loans nationwide; and during

10  2001 and 2002, Wells Fargo had submitted more late requests for insurance endorsement than

11  any other FHA lender." Indeed, Wells Fargo described itself to the government as "the nation's

12  premiere FHA lender and servicer."   Specifically, Wells Fargo originated and/or sponsored

13  224,930 FHA loans totaling over $25.5 billion in mortgage value in 2001 and 2002—

14  approximately 38% more loans than the next highest lender. Wells Fargo submitted 53,558 of

15  these loans as late requests for insurance endorsement, totaling nearly $6 billion in mortgage

16  value, during this same two-year period.  The 53,558 loans were nearly three times that of the

17  next highest lender, which submitted 19,700 late requests for endorsement.

18      103.    The OIG's "audit objectives were to determine whether Wells Fargo's late

19  requests for endorsement complied with HUD's requirements, and whether Wells Fargo

20  originated FHA-insured single family mortgages according to HUD regulations, procedures, and

21  guidance."   The OIG reviewed Wells Fargo's policies and procedures and training manuals;

22  Quality Control Plan and two years of monthly quality control review reports; audits of the

23  Company's operations; and examples of HUD reviews of Wells Fargo loans, in order to

24  understand what kinds of deficiencies HUD had previously reported regarding Wells Fargo.

25      104.    The OIG report revealed that Wells Fargo improperly submitted 2,325 loans, with

26  mortgages totaling over $265 million, for insurance endorsement when the borrowers had

27  delinquent payments prior to loan submission to HUD.  The OIG found that "Wells Fargo did not

28

have adequate controls to ensure its employees followed HUD's requirements regarding late requests for insurance endorsement," and the "inappropriately submitted loans significantly increased the risk to the FHA insurance fund."   The OIG recommended that the Assistant Secretary for Housing-Federal Housing Commissioner, and Chairman, Mortgage Review Board, take appropriate administrative action against Wells Fargo based on the information contained in the OIG's findings, including (at a minimum) requiring indemnification for 2,375 loans and verifying that Wells Fargo has developed and implemented improved controls over FHA loans.

105.    The OIG further found that Wells Fargo "did not adhere to HUD requirements and prudent lending practices when processing 61 of the 74 (or 82%) loans … examined for compliance," and "[t]he 61 loan files contained at least one of the following deficiencies: unsupported assets, unsupported income, inadequate qualifying ratios, inadequate documentation, unallowable fees charged to the borrowers, derogatory credit information, underreported liabilities, potential fraud indicators, and improper approval method followed when using an automated underwriting system."   The OIG concluded that "Wells Fargo management did not take appropriate action to ensure that its staff adhered to HUD requirements when originating FHA loans and submitting them for insurance endorsement. During 2001 and 2002, Wells Fargo quality control staff continually informed management of material loan origination deficiencies; however, management did not take quick and effective measures to resolve the deficiencies."   As a result, HUD "lack[ed] assurance that the mortgagors qualified for the 61 FHA-insured loans totaling $6,664,470."

106.    The OIG report continued:

Because Wells Fargo management did not take quick and adequate action to resolve the deficiencies, the poor originations increased when the mortgage industry experienced a significant rise in loan activity, beginning in mid-2001 and continuing into 2002.  To manage the increase in loan activity, Wells Fargo relied on temporary, inadequately trained staff to support operations during this period, exacerbating the problems it was already experiencing.

The monthly quality control reviews indicated that material loan origination deficiencies actually increased, rather than decreased, as the quality control staff continued to report problems to management.

107.    The OIG, thus, also recommended that the Assistant Secretary for Housing-Federal Housing Commissioner, Chairman, Mortgagee Review Board take appropriate administrative action against Wells Fargo for not complying with HUD's requirements, including: (i) requiring Wells Fargo to indemnify HUD for the thirty-two loans totaling $3,540,855, and any related losses incurred, on the loans in which Wells Fargo did not follow HUD loan origination requirements; (ii) requiring Wells Fargo to reimburse HUD for the $1,331,639 in claims paid for the fourteen properties not yet sold, and reimburse HUD $150,801 in losses incurred on the four sold properties in which Wells Fargo did not follow HUD loan origination requirements; and (iii) verifying that Wells Fargo has implemented an effective control environment that prevents Wells Fargo from submitting loans for FHA insurance endorsement that do not meet HUD requirements.

108.    The OIG provided results of its late endorsement testing and loan file reviews to Wells Fargo during the audit, and received and evaluated the Company's responses. The OIG also held meetings and discussions with Wells Fargo throughout the audit, and held an exit conference with Wells Fargo on May 27, 2004. Wells Fargo provided written comments in response to the OIG's findings on July 2, 2004.  A copy of the report was delivered to the CEO and President of Wells Fargo Home Mortgage.

109.    Subsequent OIG reports revealed the same issues, including a September 2005 OIG report finding that Wells Fargo did not comply with HUD regulations, procedures, and instructions in the processing of ten FHA-insured single-family mortgages between July 1, 2002 and June 30, 2004, with  underwriting and appraisal deficiencies including overstated income, income stability not verified, understated liabilities, creditworthiness not fully considered, unresolved inconsistencies, and insufficient or ineligible compensating factors.

**Wells Fargo Fails to Report Bad Loans to HUD**

110.    As discussed above, HUD required Direct Endorsement Lenders to perform post-closing reviews of the FHA loans they originated and to report to HUD loans that had an unacceptable risk.  This requirement provided HUD with an opportunity to investigate the loans

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

and request reimbursement or indemnification, as appropriate.   The Individual Defendants, however, decided unilaterally that Well Fargo did not have to comply with this requirement.

111.    Prior to 2003, the self-reporting regulation required lenders to report loans that contained "significant discrepancies," such as "any violation of law or regulation, false statements or program abuses.... "  HUD Handbook 4060.1 REV-1, ¶6-1(H) (1993).  In 2003, the requirement was amended to require reporting of "serious deficiencies, patterns of noncompliance or fraud," HUD Handbook 4060.1 REV-1, CHG-1, ¶6-13 (2003), and lenders were instructed that loans identified as having material violations by the bank's quality control 'had to be reported, *id.* ¶6-3(J).  And in 2006, the requirement was restated to require reporting of "[f]indings of fraud or other serious violations," to include any material violations found by quality control.  HUD Handbook 4060.1 REV-2, ¶7-3(J), 7-4(D) (2006).

112.    Wells Fargo's internal memoranda demonstrate that the Company was aware of HUD's requirement to report in writing loans affected by fraud and other serious violations, but ignored this obligation.  Wells Fargo's Quality Control plan, which was provided to HUD in or about May 2004, declared that the Company would report to HUD "when fraud or other serious violations of FHA requirements are identified (whether during the normal course of business or by Quality Control staff during reviews/audits of FHA loans)."  Similarly, a Wells Fargo internal memorandum from August 2005 confirmed that the Company knew that "HUD has always requested significant findings or fraud on FHA loans be reported to HUD."

113.    Behind closed doors, however, the Company decided to disregard the self-reporting requirement entirely.  It did so by simply ignoring its self-reporting obligations prior to 2004, and then redefining the reporting requirement so narrowly as to eliminate it.  At or about the time of a HUD-Office of the Inspector General audit in 2004, Wells Fargo management first began to concern themselves with the topic of reporting bad loans to HUD.  According to a memorandum dated April 8, 2004, the Vice President of Division Quality Management (the "VP of Quality Control") was "organiz[ing] a working group to address reporting to HUD."  This "working group" was tasked with reviewing and reporting "fraud, significant credit risks,

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1  significant servicing risks, EPD issues, non-owner occupied issues, [and] fair lending issues."

2  Despite the inception of this new "working group," however, no self-reporting occurred.

3      114.   Rather, in August 2004, the "working group" agreed not to follow the HUD

4  reporting requirements and not to report loans to HUD that it internally identified as containing

5  material violations of HUD requirements.   In an August 13, 2004 memorandum bearing the

6  subject line "Reporting Process to HUD," the author recounts issues discussed in the recent

7  working group call, stating that "[Wells Fargo Home Mortgage] is required to report violations

8  and deficiencies that are identified.   Fraud or other serious deficiencies must be reported to

9  Director of HUD … within 60 days of initial discovery. It was agreed that loans reviewed and

10  rated material through the Quality Assurance process would not necessarily meet that definition."

11      115.   Later, the Quality Control working group further unilaterally narrowed the

12  Company's reporting obligations.  In response to an April 2005 e-mail from Wells Fargo's FRM

13  Director that laid out numerous HUD reporting requirements and requested specific guidance on

14  reporting broker fraud, the VP of Quality Control stated that he and two others had reviewed the

15  reporting requirements and had "determined 'serious deficiencies' did not include material

16  findings and unallowable fees, but that systemic fraud issues need to be reported to HUD ... One-

17  off borrower fraud generally would not be reported, but [loan officer], broker, appraiser, realtor

18  fraud would be."   Yet, the Company did not even comply with its own unilaterally narrowed

19  formulation of Wells Fargo's reporting obligation, and continued not to self-report any loans.

20      116.   In an inter-office memorandum to "Senior Management" on August 4, 2005,

21  before the Company had begun self-reporting to HUD, the Wells Fargo "HUD Deficiency

22  Reporting Cross Functional Team" listed the following two concerns about starting to self-

23  report: First, the team highlighted that "[b]y self-reporting all significant audit results and

24  suspected fraud to HUD on FHA originations, [Wells Fargo Home Mortgage] has potentially

25  given HUD a list of loans which could result in indemnification from HUD."   In other words, the

26  Company's bottom line would be hurt by complete self-reporting.   Second, the team underscored

27  that "[Wells Fargo Home Mortgage] will be reporting audit findings for wholesale brokers.  This

28

- 40 -

1    could cause client issues or concerns, depending upon direction other lenders take."  Again, the

2    Company's overriding concern rested with losing some wholesale FHA business, thereby

3    affecting the Company's profits.

4         117.   Then in 2006, the Company issued improper statements regarding its purported

5    compliance with its self-reporting obligations.  In a January 18, 2006 letter responding to HUD's

6    concerns, the Division Presidents of Wells Fargo Home Mortgage acknowledged that "HUD

7    requires that 'serious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees

8    must be report[ed] in writing,'" and then falsely represented that "[p]rocedures are, and have

9    been, in place to report appropriate items to the HUD Homeownership Centers."  The Division

10   Presidents then described these procedures, which supposedly included "obtaining input from

11   various groups including Quality Assurance, Fraud Risk management, Legal Servicing, etc.,"

12   and assured HUD that "[r]egular meetings are held to discuss what files should be reported."

13   They explained the Company's prior self-reporting policy as follows: "[h]istorically Wells Fargo

14   interpreted HUD's [self-reporting] requirement … to mean that reporting was required on

15   incidents that involve several files or patterns of fraud or non-compliance...."  Based on this

16   interpretation, the Division Presidents continued, "Wells Fargo did not report *every* incident of

17   fraud or non-compliance that involved a single instance or file, but rather focused on reporting

18   larger global fraud issues which involved numerous parties and files."  They assured HUD,

19   however, that the Company had now "broadened its reporting requirements to meet the guidance

20   provided" in HUD's May 27, 2005 Mortgagee Letter.  Wells Fargo's abject failure to report a

21   single loan prior to October 2005, however, renders those representations inaccurate.

22        118.   Following HUD's inquiry, Wells Fargo began to self-report loans, but even then it

23   failed to adhere to its own self-reporting policy and, more importantly, failed to comply with

24   HUD's self-reporting regulations.  Indeed, through December 2010, the Company's self-reporting

25   was cursory at best.  During a five-year period, Wells Fargo, the largest originator and sponsor of

26   FHA home mortgages for much, if not all, of this period, self-reported fewer than 250 loans.

27

28

- 41 -

119.   It was not until June 2011, shortly after the United States Attorney's Office for the Southern District of New York served Wells Fargo with a subpoena, that Wells Fargo began self-reporting a more significant quantity of loans, and, on information and belief, retroactively reported loans back to the beginning of 2011.

120.   Wells Fargo's complete failure to self-report bad loans prior to October 2005, and woefully inadequate reporting thereafter, stands in stark contrast to the findings of Wells Fargo's QA reviews.  From January 2002 through December 2010, Wells Fargo reported 238 loans to HUD.  In contrast, during that same time, Wells Fargo QA identified 6,558 loans as having a material violation.  Of those, 2,628 were identified through randomly sampled QA reviews, 3,142 from mandated EPD reviews, and an additional 788 through targeted reviews.  Wells Fargo failed to report 6,320 of these "material" risk loans to HUD.  Those loans alone resulted in FHA's payment of nearly $190 million in FHA benefits on defaulted mortgage loans.

121.   Moreover, on information and belief, the 6,558 "material" risk-rated loans that QA identified do not constitute the universe of bad loans that Wells Fargo was aware of and failed to self-report.  For example, the 6,558 loans do not include any loans that FRM determined during this period were affected by fraud or other serious violations.  Accordingly, there are additional loans containing material violations that Wells Fargo should have self-reported to HUD and that almost certainly resulted in insurance claims that FHA was required to satisfy.

122.   Further, Wells Fargo QA failed to review all EPDs as required under the HUD Handbook.  That is because, according to QA, the loan file often "was not available for·review." On average, approximately 20% of the FHA EPDs were not reviewed each month by QA.  For example, in its July 2002 report, QA reported that there were thirty-six FHA EPDs, but QA reviewed only twenty-four.  The next month there were twenty-nine FHA EPDs, but QA reviewed only twenty.  The following month there were forty-one EPDs, but QA reviewed only thirty.

123.   This failure is particularly problematic because a loan that is sixty days in default within the first six months after origination has an increased likelihood of fraud or other serious

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1   violations.   As a result of QA's failure to review all EPDs, Wells Fargo never identified

2   additional loans that contained unacceptable risk and never self-reported these loans to HUD.   As

3   a consequence, HUD never had the opportunity to investigate these loans or request

4   reimbursement or indemnification, and FHA was required to pay insurance claims on these loans

5   when they defaulted.

6        124.   Accordingly, Wells Fargo's failure to self-report over 6,000 FHA loans that did

7   not meet HUD requirements and review all EPDs caused the FHA to pay hundreds of millions of

8   dollars in insurance claims for loans that were not eligible for insurance.   Furthermore, Wells

9   Fargo actually received hundreds of millions of dollars in FHA payments on those false claims,

10   as the Company not only falsely certified those mortgages for government insurance, but also

11   remained the holder of record for the vast majority of those mortgages, such that it submitted the

12   claims and received the insurance payments for nearly all of the loans that defaulted.

13   Specifically, of the 6,320 "material" risk-rated loans that Wells Fargo failed to self-report, 1,443

14   of those loans defaulted and resulted in claims being submitted for FHA insurance. Wells Fargo

15   remained the holder of record on 97% of the 1,443 loans, and received more than $185 million in

16   FHA insurance payments in connection with claims submitted for those loans.  The United States

17   Attorney's Office for the Southern District of New York filed suit on October 9, 2012, seeking

18   treble damages on the $185 million in insurance payments made on the 1,443 FHA loans that (i)

19   were internally identified by Wells Fargo as "Material Violations", (ii) were not self-reported by

20   Wells Fargo, (iii) went into foreclosure, and (iv) had FHA insurance claimed and paid by the

21   government.

22   **The Individual Defendants Knew (or Were Reckless in Not Knowing) About the**

23   **Company's Reckless FHA Loan Origination and Underwriting Practices and Failure to Self-Report in Violation of HUD Regulations**

24        125.   The Individual Defendants—including the members of the Board and relevant

25   Board Committees—were aware (or were reckless in not being aware) of Wells Fargo's improper

26   FHA loan administration practices, inadequate quality control program, FHA loans improperly

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1    submitted to HUD for payment, false certifications submitted to HUD in connection with those

2    loans, and failure to self-report those loans to HUD.

3         126.   Wells Fargo's Team Member Code of Ethics and Business Conduct provides that

4    employees must "[c]onduct[] all aspects of Wells Fargo's business and community involvement

5    in an honest, ethical, and legal manner and in accordance with federal laws, rules, and

6    regulations and the applicable laws, rules, and regulations of all localities, states and countries

7    where Wells Fargo does business," and "[c]ompl[y] with Wells Fargo's policies and procedures."

8    Similarly, the Company's Director Code of Ethics provides that directors "are expected to act in a

9    manner that will serve the best interests of Wells Fargo[,] … that is fair, honest and trustworthy[,

10   and] that is in compliance with applicable laws, rules and regulations. "   The Individual

11   Defendants were well aware of the importance of ensuring legal and regulatory compliance.

12   Indeed, the risk factors cited in Wells Fargo's Annual Reports on Forms 10-K filed with the U.S.

13   Securities and Exchange Commission ("SEC") discuss, among other things, the importance of

14   complying with regulations from federal and state agencies and monitoring the Company's

15   reputation risk.  In the Company's Form 10-K for fiscal year 2004 filed with the SEC on March

16   10, 2005, the Company stated: "[I]f we do not comply with laws, regulations or policies, we

17   could receive regulatory sanctions and damage to our reputation."  The Form 10-K also stated:

18
19   > Negative public opinion can result from our actual or alleged conduct in any
     > number of activities, including lending practices, corporate governance and
20   > acquisitions, and from actions taken by government regulators and community
     > organizations in response to those activities. Negative public opinion can
21   > adversely affect our ability to keep and attract customers and can expose us to
     > litigation and regulatory action. Because virtually all our businesses operate under
22   > the "Wells Fargo" brand, actual or alleged conduct by one business can result in
     > negative public opinion about other Wells Fargo businesses.

23        127.   The Individual Defendants, thus, were aware of, and had a duty to ensure

24   compliance with, the Direct Endorsement Lender requirements, including (among other things):

25   (i) acting with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings

26   with HUD, including making full and fair disclosures to HUD of all material facts and taking on

27   the  affirmative  duty  of  employing  reasonable  care  to  avoid  misleading  HUD  in  all

28

circumstances; (ii) ensuring that the underwriters evaluate each mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy, of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies, and procedures; (iii) employing underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner; (iv) maintaining a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters; (v) complying with governing HUD Handbooks to evaluate a borrower's credit; (vi) ensuring that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks; (vii) implementing and maintaining a quality control program independent of mortgage origination and servicing functions that (among other things) reviews a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines and conducts a full review of all loans going into default within the first six payments and reports its findings to senior management within one month completion of the initial report (along with the actions being taken, the timetable for their completion, and any planned follow-up activities); (viii) ensuring that management takes prompt corrective action to deal with any material findings by the quality control department; and (ix) making an annual certification of compliance with the program's qualification requirements and certifying after each mortgage closing that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is eligible for HUD mortgage insurance.

128.   Wells Fargo's improper FHA loan origination and related practices, and violations of HUD requirements, came to the Individual Defendants' attention as a result of both internal reviews and government investigations. First, Wells Fargo's QA department conducted monthly reviews of a sample of FHA loans and EPDs, while the FRM department reviewed loans potentially involving fraud or misrepresentations. Both the QA and FRM departments made

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

monthly reports to senior management summarizing (among other things) their findings and the percentage of loans reviewed in various categories and lines of business that contained "material" risk ratings.  These reports reiterated monthly the staggering "material" violation rates in the Company's FHA loans, which far exceeded the Company's stated maximum rate for material violations and indicated that there were problems with the Company's controls for ensuring compliance with HUD requirements.  These were not near misses that went unnoticed by Wells Fargo's Board and senior management.

129.    Specifically, while the Company set an internal benchmark maximum of 5% for the percentage of FHA loans that should contain a "material" violation, the monthly QA reports repeatedly revealed that the actual percentage of material violations drastically exceeded the stated goal on a consistent basis.  The material violation rate was between 15%-25% in 2000, exceeded 25% in nearly every month between May 2001 and January 2003, and never dipped below 42% between April 2002 and October 2002 (reaching as high as 48%).  Month after month the QA department reported to management about the significant problems it was finding with respect to the Company's retail FHA loans.  Indeed, a former Wells Fargo FRM manager admitted that the FRM "deep dive" investigations (and corresponding FRM reports) uncovered a "dirty underbelly of bad loan officers."  Yet, management took no action—there were no written plans for corrective action, no follow-up on the material violations, and no self-reporting of the material deficiencies to HUD. On the contrary, despite an increase in the origination of FHA loans, management slashed the number of underwriters by more than 50% and continued the improper practice of paying underwriters bonuses based on the number of loans they approved.

130.    As a result, the material violation rates for randomly sampled retail FHA loans remained extremely high between 2003 and 2005 (over 20% in many months), while the moderate violation rate (which encompassed underwriting violations that actually were material to whether the loans met HUD's requirements and were eligible for FHA insurance) escalated— e.g., for eighteen consecutive months the combined material and moderate violation rate hovered between 70% and 80%, hitting a high of 87.2% in July 2003 and never dipping below 63%.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

131.   At the same time these internal reviews were exposing Wells Fargo's massive violation rates, the OIG was conducting audits of the Company's FHA loan origination practices and issuing reports indicating that (among other things) the Company did not take appropriate action to ensure adherence to HUD requirements when originating FHA loans and submitting them for insurance endorsement.  For example, the 2004 OIG report revealed that Wells Fargo "did not adhere to HUD requirements and prudent lending practices when processing 61 of the 74 loans … examined for compliance," and "[t]he 61 loan files contained at least one of the following deficiencies: unsupported assets, unsupported income, inadequate qualifying ratios, inadequate documentation, unallowable fees charged to the borrowers, derogatory credit information, underreported liabilities, potential fraud indicators, and improper approval method followed when using an automated underwriting system."  In connection with its audit, the OIG reviewed Wells Fargo's policies and procedures and training manuals, the Company's QA Plan, two years of monthly quality control review reports, audits of the Company's operations, and examples of HUD reviews of Wells Fargo loans.  The OIG provided results of its review to Wells Fargo during the audit, and received and evaluated the Company's written comments in response. The OIG also held meetings and discussions with Wells Fargo throughout the audit and held an exit conference with the Company.  A copy of the report was delivered to the CEO and President of Wells Fargo Home Mortgage.

132.   The incredibly high rates of material and moderate violations in the origination of FHA loans, and the simultaneous OIG report and findings, were easily detected by the Company's QA and FRM departments, and they likewise could not and did not go unnoticed by the Board and the Company's executive officers.  Indeed, as the Company's Annual Reports on Forms 10-K filed with the SEC make clear, "managing credit risk is a company-wide process." Wells Fargo's directors and officers had a duty to ensure that the Company complied with all legal and regulatory requirements, including HUD requirements for Direct Endorsement Lenders.  According to Wells Fargo's Annual Reports on Forms 10-K filed with the SEC in 2001, 2002, and 2003, the Company had an internal risk analysis and review staff that

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

continuously reviewed loan quality ***and reported the results of its examinations to executive management and the Board of Directors***.  As a result of its continuous review of the quality of the Company's loans, the internal risk analysis and review staff was aware of the issues with the Company's FHA loan origination and underwriting practices and the 2004 OIG report and findings.  Thus, at a minimum, the Individual Defendants were made aware of the staggering material (and moderate) violation rates in the Company's FHA loan portfolio through reports from the internal risk analysis and review staff.  The Board met regularly during the relevant time period: six times per year in 2001-2004; eight times per year in 2005 and 2006; seven times in 2007; fifteen times in 2008 and 2009; and eight times in 2010.  In accordance with the Company's Corporate Governance Guidelines, the Director Defendants regularly attended Board meetings, and information and data concerning the Company's legal and regulatory compliance in the face of astounding violations and adverse government findings would have been and was distributed to and reviewed by the Director Defendants in advance of the meetings.  The Director Defendants and Officer Defendants were, thus, aware (or were reckless in not being aware) of the Company's alarming FHA loan violation rates that far exceeded the Company's stated standard, its improper loan origination practices, the lack of controls to ensure compliance with HUD regulations, the improper submission of FHA loans to HUD, the false certifications submitted to HUD, and the failure to self-report problem loans to HUD.  Yet, the Individual Defendants took no action to ensure the Company's compliance with the applicable legal and regulatory requirements in breach of their fiduciary duty of loyalty.

133.    Moreover, the Board was already acutely aware of public scrutiny of the Company's mortgage lending practices and, in fact, conducted an internal review of the Company's lending practices around that time.  Specifically, in the Company's Proxy Statement on Form DEF 14A filed with the SEC on March 19, 2004, the Board recommended a "no" vote in response to a shareholder proposal requesting that the Board study ways of linking executive compensation to successfully addressing predatory lending practices.  After its review, in recommending a vote against the proposal, the Board stated that "[t]he Company … maintains

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

comprehensive monitoring and audit procedures to ensure compliance with fair lending laws and corporate policy," "the Company's compensation and commission policies are designed to encourage appropriate sales practices," and the Company "has established compensation practices that do not reward executives for deviation from its stated policies."  The Director Defendants were well aware of public criticism of the Company's mortgage lending practices and had already conducted an internal investigation into the practices.  They were certainly not ignorant of the truth about Wells Fargo's FHA lending practices.

134.    The failure to act in the face of known wrongdoing is particularly egregious in the case of the Audit and Examination Committee Defendants.  The Audit and Examination Committee Defendants reviewed with management and Wells Fargo's General Counsel the correspondence between the Company and the OIG and HUD, including the 2004 OIG report and the Company's response letter, and correspondence between the Company and HUD regarding self-reporting regulations.  The Audit Committee Defendants also reviewed internal reports and management actions to address issues related to compliance with Company policies, including (among other things) internal reports regarding the violation rates for Wells Fargo's FHA home loans and the Company's compliance with HUD requirements, reports from the internal risk analysis and review staff regarding the quality of the Company's home mortgage loans, internal reports regarding the Company's compliance (or non-compliance) with HUD's self-reporting regulations, and the actions taken by management in response to the OIG report.  Further, the Audit and Examination Committee Defendants were required to determine that appropriate actions were taken to resolve the Company's non-compliance with legal and regulatory requirements.  The Audit Committee Defendants, thus, determined that it was appropriate for the Company to stand put in the face of astronomically high FHA loan violation rates and the 2004 OIG report and to not self-report *any* material violation FHA loans to HUD from 2001-2005 (and inadequately self-report after that).  The Audit and Examination Committee was extremely active during the wrongdoing alleged herein, meeting four times in 2001; seven times in 2002; eight times in 2003-2005; twelve times in 2006; eleven times in

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

2007; ten times in 2008 and 2009; and nine times in 2010 and 2011.  Yet, the Audit and Examination Committee Defendants failed to take any action to fix or prevent the Company's improper FHA loan origination and underwriting practices or to ensure that the Company complied with HUD regulations mandating self-reporting, despite their unique knowledge gained as members of the Audit and Examination Committee.

135.    The Credit Committee Defendants also breached their fiduciary duties by failing to act despite their unique knowledge of the Company's failure to comply with HUD regulations. The Credit Committee Defendants, among other things: (i) monitored the performance and quality of the Company's credit portfolio, including criticized/classified and nonperforming assets, consumer loan delinquencies and net charge-offs; (ii) oversaw the administration and effectiveness of, and compliance with the Company's credit policies, including through the loan-quality grading and examination process, internal and external audits and examinations of the Company's credit processes; and (iii) reviewed and approved annual reviews of the credit quality plan for the coming year and the Company's real estate lending policies.  The Credit Committee Defendants, thus, reviewed and were intimately aware of the significant issues with the Company's FHA loan origination practices (including the astounding violation rates) and the Company's failure to comply with HUD regulations, including with regard to self-reporting.  The Credit Committee Defendants also were aware of and approved annually the Company's real estate lending policies, including its policies regarding FHA lending.  The Credit Committee met three times per year from 2001-2007 and four times per year from 2008-2011.  The Credit Committee reported to the Board (including the members of the Audit and Examination Committee) regarding all of the above matters.  Yet, like the Board and Audit and Examination Committee members, the Credit Committee Defendants breached their fiduciary duty of loyalty by consciously failing to act in the face of known violations by the Company.

**DAMAGES TO WELLS FARGO**

136.   As a result of the Individual Defendants' improprieties, Wells Fargo engaged in illicit business practices which include knowingly or recklessly underwriting bad loans and fraudulently inducing the FHA to insure any losses as a result thereof.

137.   As a direct and proximate result of Individual Defendants' actions, Wells Fargo has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)   costs incurred in defending against, and the potential settlement of, legal proceedings brought against the Company including the action brought by the United States Attorney for the Southern District of New York;

(b)   any potential fines, sanctions, and disciplinary actions taken against the Company as a result of the illegal activities engaged in by the Individual Defendants; and

(c)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Wells Fargo.

138.   Moreover, these actions have irreparably damaged Wells Fargo's business, corporate image, and goodwill.   The Individual Defendants' involvement in the detrimental subprime mortgage-lending business has caused the Company to incur public scorn and has impaired Wells Fargo's credibility with HUD.   In addition, for at least the foreseeable future, Wells Fargo will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have perpetrated a fraud, such that Wells Fargo's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

139.   Plaintiff brings this action derivatively in the right and for the benefit of Wells Fargo to redress injuries suffered, and to be suffered, by Wells Fargo as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Wells Fargo is named as a nominal

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1    defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on

2    this Court that it would not otherwise have.

3        140.    Plaintiff will adequately and fairly represent the interests of Wells Fargo in

4    enforcing and prosecuting its rights.

5        141.    Plaintiff is a Wells Fargo shareholder, was a shareholder of Wells Fargo at the

6    time of the wrongdoing complained, and has continuously been a shareholder of Wells Fargo.

7        142.    The current Board of Wells Fargo consists of the following fourteen individuals:

8    defendants Stumpf, Baker, Milligan, Swenson, Engel, Runstad, Hernandez, Sanger, Dean, Chen,

9    and James, and non-defendants Elaine L. Chao, Federico F. Peña, and Howard V. Richardson.

10   Plaintiff has not made any demand on the Board because such a demand would be a futile and

11   useless act, particularly for the reasons stated below.

12   **Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of
     Liability**

13

14       143.    The Director Defendants had a known duty to ensure that Wells Fargo complied

15   with all legal and regulatory requirements, including those imposed by HUD on the Company as

16   a Direct Endorsement Lender.    Wells Fargo's improper FHA loan origination and related

17   practices, and violations of HUD requirements, came to the Director Defendants' attention as a

18   result of both internal reviews and government investigations.  The internal reports circulated by

19   the Company's QA and FRM departments revealed enormous material (and moderate) violation

20   rates (up to 48%) that far exceeded the Company's stated benchmark violation rate (5%) from at

21   least 2001-2005.  No action was taken, no self-reporting was done (until 2006 when inadequate

22   self-reporting began), and underwriters continued to be improperly paid bonuses based on the

23   number of loans they approved.  At the same these internal reviews were revealing Wells Fargo's

24   massive violation rates, the OIG  was auditing the Company's FHA loan origination practices

25   and issuing reports indicating that (among other things) the Company did not take appropriate

26   action to ensure adherence  to HUD requirements when originating FHA loans and submitting

27   them for insurance endorsement (with respect to sixty-one of the seventy-four loans examined in

28   the OIG's 2004 audit the Company did not adhere to HUD requirements and prudent lending

- 52 -

practices).  The Director Defendants were well aware of the Company's FHA loan origination and self-reporting issues.   The Company's internal risk analysis and review staff—which continuously reviewed the Company's loan quality and, thus was aware of the issues with the Company's FHA loan origination practices and the 2004 OIG report and findings—reported the results of its examinations to executive management and the Board.  Thus, at a minimum, the Director Defendants were made aware of the staggering material (and moderate) violation rates in the Company's FHA loan portfolio through reports from the internal risk analysis and review staff.   In accordance with the Company's Corporate Governance Guidelines, the Director Defendants regularly attended Board meetings, and information and data concerning the Company's legal and regulatory compliance in the face of astounding violations and adverse government findings would have been and was distributed to and reviewed by the Director Defendants in advance of the meetings.  Moreover, the Board was already acutely aware of public scrutiny of the Company's mortgage lending practices and, in fact, conducted an internal review of the Company's lending practices around the same time in responding to a shareholder proposal.  The Director Defendants were, thus, aware (or were reckless in not being aware) of the Company's alarming FHA loan violation rates that far exceeded the Company's stated standard, its improper loan origination practices, the lack of controls to ensure compliance with HUD regulations, the improper submission of FHA loans to HUD, the false certifications submitted to HUD, and the failure to self-report problem loans to HUD.  Yet, the Director Defendants took no action to ensure the Company's compliance with the applicable legal and regulatory requirements, which has exposed Wells Fargo to legal liability, civil sanctions, fines, and other penalties.  For this, they face a substantial likelihood of liability, rendering demand futile.

144.   The Audit and Examination Committee Defendants face a particularly substantial threat of personal liability, further excusing demand on these defendants.  The Audit and Examination Committee Defendants reviewed with management and Wells Fargo's General Counsel the correspondence between the Company and the OIG and HUD, including the 2004

OIG report and the Company's response letter, and correspondence between the Company and HUD regarding self-reporting regulations. The Audit and Examination Committee Defendants also reviewed internal reports and management actions to address issues related to compliance with Company policies, including (among other things) internal reports regarding the violation rates for Wells Fargo's FHA home loans and the Company's compliance with HUD requirements, reports from the internal risk analysis and review staff regarding the quality of the Company's home mortgage loans, internal reports regarding the Company's compliance (or non-compliance) with HUD's self-reporting regulations, and the actions taken by management in response to the OIG report. Further, the Audit and Examination Committee Defendants were required to determine that appropriate actions were taken to resolve the Company's non-compliance with legal and regulatory requirements. The Audit and Examination Committee Defendants, thus, determined that it was appropriate for the Company to stand put in the face of astronomically high FHA loan violation rates and the 2004 OIG report and to not self-report *any* material violation FHA loans to HUD from 2001-2005 (and inadequately self-report after that). Yet, the Audit and Examination Committee Defendants failed to take any action to fix or prevent the Company's improper FHA loan origination practices or to ensure that the Company complied with HUD regulations mandating self-reporting, despite their unique knowledge gained as members of the Audit and Examination Committee. The failure to take action in the face of known violations is a breach of the duty of loyalty. The Audit Committee Defendants face a substantial likelihood of liability, and any demand is, therefore, futile.

145.    The Credit Committee Defendants also face a substantial likelihood of liability for breaching their fiduciary duties by failing to act despite their unique knowledge of the Company's failure to comply with HUD regulations. The Credit Committee Defendants, among other things: (i) monitored the performance and quality of the Company's credit portfolio, including criticized/classified and nonperforming assets, consumer loan delinquencies, and net charge-offs; (ii) oversaw the administration and effectiveness of, and compliance with the Company's credit policies, including through the loan-quality grading and examination process,

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

internal and external audits, and examinations of the Company's credit processes; and (iii) reviewed and approved annual reviews of the credit quality plan for the coming year and the Company's real estate lending policies.  The Credit Committee Defendants, thus, reviewed and were intimately aware of the significant issues with the Company's FHA loan origination practices (including the astounding violation rates) and the Company's failure to comply with HUD regulations, including with regard to self-reporting.  The Credit Committee Defendants also were aware of and approved annually the Company's real estate lending policies, including its policies regarding FHA lending.  The Credit Committee met three times per year from 2001-2007 and four times per year from 2008-2011.  The Credit Committee reported to the Board (including the members of the Audit and Examination Committee) regarding all of the above matters.  Yet, like the Board and Audit and Examination Committee members, the Credit Committee Defendants breached their fiduciary duty of loyalty by consciously failing to act in the face of known violations by the Company.  They face a substantial likelihood of liability for breaching the duty of loyalty and any demand is, thus, excused as futile.

146.    The acts complained of constitute violations of the fiduciary duties owed by Wells Fargo's officers and directors and are incapable of ratification.

147.    Wells Fargo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.  Despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Wells Fargo any part of the damages Wells Fargo suffered and will suffer thereby.  The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the misconduct alleged herein in the face of heavy media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

148.   Plaintiff has not made any demand on the other shareholders of Wells Fargo to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Wells Fargo is a publicly held company with over 5.2 billion shares outstanding and thousands of shareholders;

(b)   making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)   making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duties Against the Individual Defendants

149.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.   As alleged in detail herein, Individual Defendants by reason of their positions as officers and directors of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner.

151.   The Officer Defendants owed Wells Fargo the highest duty of loyalty and care. These defendants breached their duty of loyalty and care by knowingly, recklessly, or with gross negligence causing the Company to engage in improper underwriting and reporting practices.  As demonstrated by the Company's internal documents and e-mails, management knew or recklessly disregarded that these illicit practices were being implemented.   Accordingly, the Officer Defendants breached their duty of care, good faith, and loyalty.

152.   The Director Defendants of the Company owed Wells Fargo the highest duty of loyalty.  These defendants breached their duty of loyalty by knowingly or recklessly causing the

- 56 -

Company to underwrite bad loans and inducing the Government to insure these loans when they defaulted.   The Director Defendants also knowingly or recklessly reviewed and approved improper statements concerning the quality of the Company's loans and its compliance with applicable rules and regulations to HUD.   Accordingly, the Director Defendants breached their duty good faith and loyalty.

153.    The Audit and Examination Committee Defendants and the Credit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the Company's core mortgage-lending business to defraud the Government.   Moreover, the Audit and Examination Committee Defendants and Credit Committee Defendants reviewed and approved a series of improper statements regarding the purported quality of the Company's residential mortgage loans and also the Company's purported compliance with HUD rules and regulations.

154.    As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

155.    Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    As a result of the illegal business practices detailed herein, the Individual Defendants have caused Wells Fargo to incur substantial costs.   In fact, the Company is incurring additional costs from the pending lawsuit brought by the United States Attorney's Office for the Southern District of New York.   The Government is seeking hundreds of millions of dollars in damages.

158.    Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

159.   As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

160.   Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Unjust Enrichment

161.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.   By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Wells Fargo.  Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Wells Fargo.

163.   Plaintiff, as a shareholder and representative of Wells Fargo, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

164.   Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.   Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Wells Fargo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

1.     a proposal to strengthen Board oversight of Wells Fargo's underwriting and reporting policies and procedures, including fair disclosure to the Government of such policies and procedures;

2.     a proposal to strengthen the Company's disclosure controls over the quality of its residential mortgage loans;

3.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.     a provision to permit the shareholders of Wells Fargo to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Wells Fargo has an effective remedy;

D.     Awarding to Wells Fargo restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 8, 2013

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS

*/s/ Shane P. Sanders*
SHANE P. SANDERS

600 B Street, Suite 1900
San Diego, CA 92101

- 59 -

1

Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@ robbinsarroyo.com
ssanders@ robbinsarroyo.com

2

3

LAW OFFICES OF ALFRED G. YATES, JR.
ALFRED G. YATES JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033
yateslaw@aol.com

4

5

6

7

8

Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC

<u>VERIFICATION</u>

I, Richard Gulbrandsen, hereby declare as follows:

I am the plaintiff in the within entitled action.   I have read the Verified Amended Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Amended Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:___7/8/2013_____

_____
RICHARD GULBRANDSEN

1

2

## **CERTIFICATE OF SERVICE**

3
        I hereby certify that on July 8, 2013, I authorized the electronic filing of the foregoing

4
with the Clerk of the Court using the CM/ECF system which will send notification of such filing

5
to the e-mail addresses denoted on the attached Electronic Mail Notice List.

6
        I certify under penalty of perjury under the laws of the United States of America that the

7
foregoing is true and correct.  Executed on July 8, 2013.

8

9
                                                          */s/ Shane P. Sanders*
                                                        SHANE P. SANDERS

10

11
880605

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 3:12-cv-05968-JSC