IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD GULBRANDSEN, Derivatively on Behalf of WELLS FARGO & COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JOHN G. STUMPF, et al.,<br><br>Defendants. | Case No. 12-5968 JSC<br><br>**ORDER GRANTING MOTION TO DISMISS**<br>(Dkt. No. 66) |

In this shareholder derivative action, Plaintiff seeks to hold the individual defendants liable for Wells Fargo & Company's misconduct in originating and underwriting home mortgage loans insured by the Federal Housing Administration ("FHA"). This lawsuit was filed a few weeks after the United States filed suit against Wells Fargo Bank, N.A. in the Southern District of New York seeking reimbursement for hundreds of millions of dollars the FHA paid on bad loans. Prior to initiating this action, Plaintiff did not make a demand of the Wells Fargo & Company ("Wells Fargo") Board of Directors and the Court previously dismissed the complaint for Plaintiff's failure to adequately plead demand futility. (Dkt. No. 57.) Now pending before the Court is Defendants' Motion to Dismiss the First Amended Complaint ("FAC" or "Amended Complaint"). (Dkt. No. 66.) Defendants again argue that Plaintiff has not sufficiently pled futility of demand. After considering the parties'

submissions, and having had the benefit of oral argument on November 21, 2013, the Court GRANTS Defendants' motion to dismiss without leave to amend.

## ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

From May 2001 through December 2010, Wells Fargo improperly certified to the United States Department of Housing and Urban Development ("HUD") that over 100,000 of its high-risk residential mortgage loans met HUD's requirements for proper origination and underwriting, and thus were eligible for FHA insurance. Under the FHA Direct Endorsement program, HUD insured the loans that Wells Fargo was originating. This program is intended to help low- to moderate-income families become homeowners by encouraging mortgage lenders to make loans to creditworthy borrowers who otherwise might not meet conventional underwriting requirements. In the event that a borrower defaults on an FHA-insured mortgage, the lender or other party holding the mortgage submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property. HUD then pays off the balance of the mortgage and other related costs and may assume ownership of the property. The Direct Endorsement program grants the lender the authority to decide whether the borrower represents an acceptable credit risk for HUD, and to certify loans for FHA mortgage insurance without prior HUD review or approval.

"[A]t the direction and/or with the tacit approval" of the Defendants[1]—all current or former members of Wells Fargo's Board or Wells Fargo executives—Wells Fargo "engaged in a regular practice of reckless origination and underwriting of its retail FHA loans and falsely certified to HUD that tens of thousands of those loans were eligible for FHA insurance." (Dkt. No. 63 ¶ 83.) Defendants were alerted to multiple "red flags" through Wells Fargo's internal reviews of its mortgage portfolio. (*Id.* at ¶¶ 93-96.) Wells Fargo's home mortgage division's quality control function comprised both the Fraud Risk Management ("FRM") and Quality Assurance ("QA") departments. The QA department's procedures included the following with respect to FHA-insured

---

[1] The Defendants who were or are Wells Fargo executives are John G. Stumpf, Richard M. Kovacevich, and Howard I. Atkins. The remaining 21 individual Defendants are or were outside directors. Collectively, the individual Defendants and Wells Fargo are the "Defendants." Plaintiff is a citizen of Illinois and all of the defendants are citizens of states other than Illinois. For diversity jurisdiction purposes, Wells Fargo is considered a defendant. *See In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1237-38 (9th Cir. 2008).

2

loans: monthly reviews of a random sample of loans originated and sponsored within the prior 60 days, reviews of at least some portion of its loans that were in early default, and preparation and circulation of internal reports of the reviews' findings. The FRM department also reviewed loans referred to it as potentially involving misrepresentations or fraud. Both the QA and FRM departments made monthly reports to "senior management." (*Id.* at ¶ 93.) QA department reports during part of the relevant time period show that the company was far exceeding its internal benchmark of 5% for material violations. For example, during a seven-month stretch from April 2002 through October 2002, the material violation rate never dipped below 42% and reached as high as 48%, meaning that nearly one out of every two retail FHA loans that Wells Fargo certified to HUD did not qualify for insurance.

At the same time these internal reviews were exposing Wells Fargo's violation rates, the Office of Inspector General ("OIG") for HUD "conducted numerous audits" of Wells Fargo's FHA loan origination practices. (*Id.* at ¶ 102.) "For example, the OIG conducted an audit of Wells Fargo from August 28, 2003 to May 14, 2004." (*Id.*) The audit of Wells Fargo was spurred by the company's high volume of late requests for FHA insurance endorsements. "The OIG's audit objectives were to determine whether Wells Fargo's late requests for endorsement complied with HUD's requirements, and whether Wells Fargo originated FHA-insured single family mortgages according to HUD regulations, procedures, and guidance." (*Id.* at 103 (internal quotation marks omitted).) In addition to finding that Wells Fargo was inappropriately submitting late FHA insurance endorsements,

> [t]he OIG further found that Wells Fargo "did not adhere to HUD requirements and prudent lending practices when processing 61 of the 74 (or 82%) loans … examined for compliance," and "[t]he 61 loan files contained at least one of the following deficiencies: unsupported assets, unsupported income, inadequate qualifying ratios, inadequate documentation, unallowable fees charged to the borrowers, derogatory credit information, underreported liabilities, potential fraud indicators, and improper approval method followed when using an automated underwriting system."

(*Id.* at ¶ 105.) The OIG concluded that "Wells Fargo management did not take appropriate action to ensure that its staff adhered to HUD requirements when originating FHA loans and submitting them for insurance endorsement. During 2001 and 2002, Wells Fargo quality control staff continually

3

informed management of material loan origination deficiencies; however, management did not take quick and effective measures to resolve the deficiencies." (*Id.* (internal quotation marks omitted).) As a result, HUD "lack[ed] assurance that the mortgagors qualified for the 61 FHA-insured loans totaling $6,664,470." (*Id.* (internal quotation marks omitted).)

The OIG recommended that "appropriate administrative action" be taken against Wells Fargo for not complying with HUD's requirements. (*Id.* at ¶ 107.) Such action included

> (i) requiring Wells Fargo to indemnify HUD for the thirty-two loans totaling $3,540,855, and any related losses incurred, on the loans in which Wells Fargo did not follow HUD loan origination requirements; (ii) requiring Wells Fargo to reimburse HUD for the $1,331,639 in claims paid for the fourteen properties not yet sold, and reimburse HUD $150,801 in losses incurred on the four sold properties in which Wells Fargo did not follow HUD loan origination requirements; and (iii) verifying that Wells Fargo has implemented an effective control environment that prevents Wells Fargo from submitting loans for FHA insurance endorsement that do not meet HUD requirements.

(*Id.*) The OIG "held meetings and discussions with Wells Fargo throughout the audit," and Wells "provided written comments in response to the OIG's findings on July 2, 2004." (*Id.* at ¶ 108.) "A copy of the report was delivered to the CEO and President of Wells Fargo Home Mortgage." (*Id.*)

"Subsequent OIG reports revealed the same issues, including a September 2005 [report]." (*Id.* at ¶ 109.) That 2005 report found that "Wells Fargo did not comply with HUD regulations, procedures, and instructions in the processing of ten FHA-insured single-family mortgages between July 1, 2002 and June 30, 2004, with underwriting and appraisal deficiencies including overstated income, income stability not verified, understated liabilities, creditworthiness not fully considered, unresolved inconsistencies, and insufficient or ineligible compensating factors." (*Id.*)

According to a memorandum dated April 8, 2004, the Vice President of Division Quality Management indicated that a working group would convene to address reporting the material violations to HUD. (*Id.* at ¶ 113.) However, no self-reporting of the material violations occurred. Rather, the working group narrowed Wells Fargo's reporting obligations, determining that only instances of systemic fraud need to be reported to HUD. Wells Fargo did not report a single material violation prior to October 2005.

In an inter-office memorandum to "Senior Management" dated August 4, 2005, the Wells Fargo "HUD Deficiency Reporting Cross Functional Team" listed the following two concerns about starting to report material violations to HUD: "First, the team highlighted that '[b]y self-reporting all significant audit results and suspected fraud to HUD on FHA originations, [Wells Fargo Home Mortgage] has potentially given HUD a list of loans which could result in indemnification from HUD.' . . . Second, the team underscored that '[Wells Fargo Home Mortgage] will be reporting audit findings for wholesale brokers. This could cause client issues or concerns, depending upon direction other lenders take.'" (*Id.* at ¶ 116.)

In an early 2006 letter "responding to HUD's concerns," the Division Presidents of Wells Fargo Home Mortgage assured HUD that the company would follow HUD's interpretation of the reporting requirements, which demand that the lender report individual instances of material violations. (*Id.* at ¶ 117.) Although Wells Fargo began to self-report its deficient loans following HUD's inquiry, from January 2002 through December 2010, the company reported only 238 loans to HUD. In contrast, during that same time, Wells Fargo's QA department identified 6,558 loans as having a material violation, resulting in FHA's payment of nearly $190 million in FHA benefits on defaulted mortgage loans.

The "incredibly high rates of material and moderate violations" detected by the QA and FRM departments, along with the OIG reports, "could not and did not go unnoticed by the Board and the Company's executive officers." (*Id.* at ¶ 132.) "According to Wells Fargo's Annual Reports on Forms 10-K filed with the SEC in 2001, 2002, and 2003, the Company had an internal risk analysis and review staff that continuously reviewed loan quality *and reported the results of its examinations to executive management and the Board of Directors*." (*Id.*) Further, "[i]n accordance with the Company's Corporate Governance Guidelines, . . . information and data concerning the Company's legal and regulatory compliance in the face of astounding violations and adverse government findings would have been and was distributed to and reviewed by the Director Defendants in advance of the meetings." (*Id.*) In addition, the Audit and Examination Committee "reviewed with management and Wells Fargo's General Counsel" correspondence between the Company and the OIG and HUD, as

well as correspondence between the Company and HUD regarding HUD's self-reporting regulations. (*Id.* at ¶ 134.) However, no action was taken. (*Id.*)

## PROCEDURAL HISTORY

On October 9, 2012, the United States filed a lawsuit in the Southern District of New York against Wells Fargo Bank, N.A., alleging that it improperly obtained FHA insurance by providing false loan level certifications from 2001-2005 and failed to self-report violations of HUD underwriting standards. (*See* Dkt. No. 67-2.) According to the SDNY Complaint, Wells Fargo obtained FHA insurance on many loans that should have never qualified for such insurance in the first place. The SDNY Complaint seeks to recover damages for losses in connection with Wells Fargo's fraudulent insurance claims. On September 24, 2013, the Southern District of New York granted in part and denied in large part Wells Fargo Bank's motion to dismiss. (Dkt. No. 72-2.)

Plaintiff filed the present action on November 21, 2012. The Court subsequently granted Defendants' motion to dismiss the Complaint with leave to amend, concluding that, among other things, Plaintiff failed to allege sufficient particularized facts to excuse demand on Wells Fargo's Board. (Dkt. No. 57 at 1.) The Court provided several reasons for its conclusion. First, the alleged "magnitude" of the conduct did not excuse demand because Plaintiff did not "allege particularized facts that allow the Court to draw an inference that any director knew or should have known about the alleged scheme." (*Id.* at 8.) Second, the allegations regarding "internal monthly reports" were not sufficient to excuse demand because Plaintiff failed to allege facts suggesting "that these monthly reports pierced the confines of the boardroom." (*Id.* at 9.) Certain Defendants' membership on the Audit Committee did not require a presumption that they were aware of the contents of the internal reports. (*Id.* at 9-10.) Finally, the allegations regarding a HUD inquiry did not excuse demand because Plaintiff did not sufficiently allege "that any member of the Board was actually aware of the inquiry or allege facts upon which such awareness may be inferred." (*Id.* at 10-11.)

The Court also ruled that Plaintiff's allegations did not meet the pleading requirements of Federal Rule of Civil Procedure 8(a) for the underlying state law claims, which were based on allegations already found to be insufficient. (Dkt. No. 57 at 13-15.) The Court also found that Plaintiff lacked standing to pursue claims relating to conduct that occurred prior to October 2002, the

1  date Plaintiff alleges purchasing Wells Fargo stock.  (*Id.* at 12-13.)  As for Defendants' argument that
2  Plaintiff failed to plead non-speculative harm to Wells Fargo, the Court was "not yet persuaded that
3  allegations of non-speculative damages are an element of a derivative action," but suggested that the
4  Court may lack subject matter jurisdiction if only speculative damages are alleged.  (*Id.* at 11-12.)
5  Plaintiff filed his FAC on July 8, 2013.  (Dkt. No. 63.)  The FAC alleges three causes of action
6  against Defendants: (1) breach of fiduciary duty; (2) waste of corporate assets; and (3) unjust
7  enrichment.

## DISCUSSION

Defendants move to dismiss the FAC on three grounds: (1) failure to plead particularized facts showing that a pre-suit demand on the Board should be excused as futile; (2) lack of subject matter jurisdiction over the asserted claims because any damages to Wells Fargo are purely speculative; and (3) failure to plead any claims upon which relief can be granted.

As an initial matter, the Ninth Circuit has held that whether a plaintiff has met the demand pleading requirements of Federal Rule of Civil Procedure 23.1 is "logically antecedent to assessing Article III issues," and thus "it is appropriate [] to reach the Rule 23.1 issue first."  *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008) ("[U]nless we determine that a proper demand was made, there is no lawsuit over which to exercise jurisdiction.").  In accordance with *Potter*, the Court will first address demand futility.

**A.   Demand Futility**

   **1.   Legal Standard**

Rule 23.1, subdivision (b)(3), of the Federal Rules of Civil Procedure ("Rule 23.1") requires a plaintiff bringing a derivative action to, among other things, "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right."  *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 96 (1991) (internal quotation marks and alterations omitted).  Rule 23.1, however, does

not establish the circumstances under which demand would be futile. *See id.* For these standards, courts turn to the law of the state of incorporation; in this instance, Delaware. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), *superseded by statute on other grounds.*

Delaware law provides two demand-futility tests, set forth in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). When a plaintiff challenges one or more specific transactions authorized by the board of directors, or other express decisions or conduct of the board, a court should employ the *Aronson* test. *Aronson* evaluates whether, under the particularized facts alleged, a reasonable doubt is created that 1) the directors are disinterested and independent, or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 812.

The *Rales* test applies "[w]here there is no conscious decision by directors to act or refrain from acting." *Rales*, 634 A.2d at 934. Under *Rales*, demand is futile when "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* Plaintiff concedes that the *Rales* test applies to this case: Plaintiff states that "the Rales test likely applies to the majority of Plaintiff's allegations," and asserts, in conclusory fashion, that if *Aronson* does apply, he has satisfied that test as well. (*See* Dkt. No. 72 at 15 n.16.)

In the context of a pre-suit demand, directors are entitled to a presumption that they were faithful to their fiduciary duties; the burden is upon the plaintiff to overcome that presumption. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004) (citation and footnotes omitted). A plaintiff must "plead facts establishing a sufficient connection between the corporate trauma and the board such that at least half of the directors face a substantial likelihood of personal liability." *South v. Baker*, 62 A.3d 1, 9 (Del. Ch. 2012). A plaintiff can plead the necessary connection by alleging with particularity either: 1) "actual director involvement in a decision or series of decisions that violated positive law;" 2) "that the board consciously failed to act after learning about evidence of illegality—the proverbial 'red flag;'" 3) "that a board of directors is dominated or controlled by key members of management, who the rest of the board unknowingly

8

allowed to engage in self-dealing transactions;" or 4) that the board failed to engage in adequate oversight as required under *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959 (Del. 1996). *Id.* Plaintiff's FAC grounds demand futility on the first two bases. In evaluating Defendants' motion to dismiss for failure to make a demand, the Court must accept the truth of all facts pleaded in the FAC, and Plaintiff is entitled to "all reasonable factual inferences that logically flow from the particularized facts alleged." *In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006).

### 2. Application of the *Rales* test

At the time the FAC was filed Wells Fargo had 14 directors, all but one who are outside directors. Thus, Plaintiff must plead particularized facts showing that at least seven of these directors could not impartially consider a demand because they face a substantial likelihood of personal liability. *Desimone*, 924 A.2d at 943. Plaintiff argues that, "[t]aken in their totality, the magnitude, rates, and duration of the HUD violations at Wells Fargo—together with internal reviews, government investigations, and the Board Defendants' specific roles in connection with risk management and compliance—show that the Board Defendants knowingly permitted the illegal practices at the Company or, at a minimum, consciously disregarded their duties as Board and committee members." (Dkt. No. 72 at 16.)

To the extent Plaintiff asserts that his allegations as to the magnitude, rate, and duration of the Company's wrongdoing excuse demand, such an argument ignores the Court's previous Order. (*See* Dkt. No. 57 at 7-8.) As already explained, "[a] stockholder cannot displace the board's authority [over the corporation's claims] simply by describing the calamity and alleging that it occurred on the directors' watch." *South*, 62 A.3d at 8. Instead, Plaintiff must plead particularized facts that reasonably support an inference that at least seven Board members knew or should have known of the alleged scheme. While Plaintiff's allegations certainly suggest that Wells Fargo's FHA-insured loan business was error-ridden, and perhaps even intentionally so, Plaintiff fails to adequately allege facts that support an inference that at least seven directors were aware of the misleading practice and consciously decided to allow it to continue. As Plaintiff conceded at oral argument, the amount of money at stake in this scheme was not material to Wells Fargo's bottom line. Plaintiff fails to explain

9

why then the magnitude and duration of the practice supports an inference of Board knowledge.

Plaintiff continues to rely on the monthly reports generated by the FRM and QA departments as the means by which the Board became aware of the Company's improper loan origination practice. The problem with Plaintiff's contention is that he still fails to adequately allege facts that support an inference that these reports "pierced the confines of the boardroom." (*See* Dkt. No. 57 at 9.) Plaintiff contends that his allegations are now sufficient because he alleges the existence of an "internal risk analysis and review staff" that, according to the Company's 2001-2003 SEC 10-K Forms, "continuously reviewed loan quality *and reported the results of its examinations to executive management and the Board of Directors*." (Dkt. No. 63 ¶ 132.) Plaintiff further alleges that "[i]n accordance with the Company's Corporate Governance Guidelines, . . . information and data concerning the Company's legal and regulatory compliance in the face of astounding violations and adverse government findings would have been and was distributed to and reviewed by the Director Defendants in advance of the meetings." (*Id.*) The Court is not persuaded.

To the extent Plaintiff argues that the Board's knowledge can be presumed because the Company's corporate governance structure *requires* that notice of the faulty lending practice reach the Board, that argument has already been rejected by this Court in its previous Order. (See Dkt. No. 57 at 9-10); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 135 (Del. Ch. 2009) ("[D]irector liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system."); *In re Google, Inc. S'holder Derivative Litig.*, 2012 WL 1611064, at *7 (N.D. Cal. May 8, 2012) (finding "plaintiffs' reliance on general code of conduct and/or corporate governance maxims" insufficient "for the court to impute notice to these defendants"); *In re Abbott Depakote S'holder Derivative Litig.*, 909 F. Supp. 2d 984, 997 (N.D. Ill. 2012) ("Pleading the existence of compliance mechanisms is insufficient to establish knowledge or awareness.").

The disclosure in Wells Fargo's 2001-2003 SEC 10-K forms that it had an internal risk analysis and review staff that "continuously reviewed loan quality and reported the results of its examinations to executive management and the Board of Directors" (Dkt. No. 63 at ¶ 132) is likewise insufficient. What was the level of review? What were the results of the staff's examination? What

10

information was actually reported? The question is not whether Plaintiff has sufficiently alleged wrongdoing by Wells Fargo. He has. The critical issue is whether Plaintiff has alleged particular facts sufficient to give rise to personal liability of the outside directors. The allegation as to loan quality reports, without particularized allegations as to the reports' contents, does not give rise to such an inference.

In addition to lacking sufficient allegations as to content, Plaintiff makes no allegation as to when the reports were provided to the directors. This omission is particularly significant because Plaintiff alleges that the internal risk and review staff, per the Company's SEC filing, made reports to management and the Board from 2001-2003; however, only six of the current directors became members of the Board in 2003 or earlier—one director short of the required seven. This fact is another reason Plaintiff's allegation that the internal risk and review staff made reports to the Board in 2001-2003 does not excuse demand.

Plaintiff also alleges that the 2004 and 2005 HUD OIG reports were within the internal risk and review staff's purview and therefore such reports were—or at least should have been—presented to the Board at one or more of the Board's meetings. Even assuming the internal risk and review staff still existed after 2003, Plaintiff again makes no particularized allegation that any current member of the Board was actually aware of either OIG report; rather, Plaintiff continues to rely on the Company's corporate governance structure to infer awareness. For the reasons stated above, that inference fails. In addition, Plaintiff again fails to allege when the Board supposedly reviewed the OIG reports. This omission matters. A majority of the current Board were not members in 2004 when the OIG issued the first report and recommended action against Wells Fargo. Plaintiff's contention that the reports are nonetheless sufficient to excuse demand because Dean joined the Board in 2005 and Stumpf served as a senior officer beginning in 2005 is unavailing given that Plaintiff does not allege with particularity when and how the Board and Stumpf were made aware of the reports.

The Court does not "infer that [the OIG's] inquiry was of such a nature that it would be expected that Board members, and perhaps Audit Committee members in particular, would be aware of [the OIG's] concerns with Wells Fargo's regulatory compliance sufficient to excuse demand." (Dkt. No. 57 at 10-11.) While the 2004 report found that a lack of adequate internal controls resulted

11

1   in 61 out of 74 audited loans being out of compliance with HUD underwriting guidelines, the FAC

2   does not allege any facts that suggest this finding would reach the Board. As Plaintiff alleges, the

3   2004 report was one of "numerous" audits the OIG conducted of Wells Fargo, suggesting that these

4   reports were commonplace and not unusual. Moreover, while the OIG recommended that HUD take

5   administrative action against Wells Fargo, Plaintiff fails to allege what action—if any—was taken. At

6   oral argument, and in response to a question from the Court, Plaintiff conceded that he had no reason

7   to believe that HUD took any action. If HUD took no action in the face of the OIG report

8   recommending it do so, the Court fails to see how it could conclude that the report was so damaging

9   that it would necessarily reach the Board. In addition, Plaintiff fails to explain why—even if the

10  Board was aware of the 2004 report—the Board would face a substantial likelihood of personal

11  liability for not acting on the report when HUD apparently decided that no administrative action

12  against the Company was warranted. While the OIG held meetings and discussions with senior

13  management throughout the audit, the Court cannot plausibly infer that senior management's

14  meetings and discussions with the OIG regarding one of "numerous" audits that resulted in no HUD

15  administrative action would reach the Board. Finally, while Plaintiff alleges that "[a] copy of the

16  report was delivered to the CEO and President of Wells Fargo Home Mortgage" (Dkt. No. 63 ¶ 108),

17  there is no allegation that plausibly suggests this person then made the Board aware of the report.

18         There is even less reason to infer that the 2005 OIG report reached the boardroom. That

19  report, which is discussed in only one sentence in the FAC, found that Wells Fargo did not comply

20  with HUD underwriting requirements in processing 10 FHA mortgages over a two-year period.

21  Given the indisputably large volume of loans Wells Fargo processes each year, it is not reasonable to

22  infer that a report concerning the inadequacies of a mere 10 loans would necessarily reach the Board.

23  In addition, Plaintiff does not allege that the report recommended administrative action against the

24  Company, further indicating the relative insignificance of the report.

25         Plaintiff again argues that an early 2006 letter from the Division Presidents of Wells Fargo

26  Home Mortgage "responding to HUD's concerns" (Dkt. No. 63 ¶ 117), "underscor[es] the

27  wrongdoing (and that the issue would have risen to the Board level)" (Dkt. No. 72 at 19). The Court

28  is still not persuaded. As alleged, the 2006 letter merely assured HUD that the company would follow

12

HUD's interpretation of the reporting requirements, which demand that the lender report individual instances of material violations; Wells Fargo had previously asserted that it need only report a pattern of violations. The FAC does not allege any facts that explain why this letter would likely reach the Board level.

Moreover, even if the Company's response to "HUD's concerns" required Board action, the Court does not agree that the letter "underscores" the Board's "tacit approval" of the illegal business strategy. (*Id.*) The Company's response to the letter—which pledges to follow HUD's interpretation—does not connect the Board to the Company's past or future wrongdoing such that a majority of the Board "face[s] a substantial likelihood of personal liability." *South*, 62 A.3d at 9. If the letter made the Board aware of the Company's past wrongs, the Board's knowledge of the Company's vow to now follow HUD's interpretation of its guidelines would not constitute condoning those past wrongs. While the Company did not, in fact, honor its vow, Plaintiff alleges no "red flags" after this 2006 letter, beyond the unspecified monthly reports discussed above, that would put the Board on notice that the Company continued to fail to report individual instances of material violations. Indeed, the SDNY lawsuit only covers the period 2001 to 2005.

Plaintiff also repeats his argument—already rejected in the Court's previous Order—that because a majority of the Board serves on either the Audit and Examination Committee or the Credit Committee, the committee members (and thus a majority of the Board) must have known of Wells Fargo's HUD violations. As the Court previously explained, to survive a motion to dismiss, Plaintiff must demonstrate that "an audit committee [member] . . . *had notice* of serious misconduct and simply failed to investigate;" mere membership on the committee is not enough. (Dkt. No. 57 at 9-10 (citing cases).) It is "contrary to well-settled Delaware law" to "infer that the directors had a culpable state of mind based on allegations that certain board members served on an audit committee and, as a consequence, should have been aware of the facts." *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008). Yet Plaintiff again fails to allege anything more than mere membership. He merely describes the Audit Committee's purpose and duties, alleges that the Committee was active during the period of alleged wrongdoing, and therefore "helped shape the path of the Company by tacitly approving certain improper behavior of management and encouraging short term goals and objectives in a way

13

that was detrimental to the Company in the long term." (Dkt. No. 63 at ¶¶ 45-47.) Plaintiff's allegations as to the Credit Committee fail for the same reasons.

Further, while Plaintiff alleges that the Audit and Examination Committee "reviewed with management and Wells Fargo's General Counsel" correspondence between the Company and the OIG and HUD, as well as correspondence between the Company and HUD regarding HUD's self-reporting regulations (Dkt. No. 63 ¶ 134), that allegation appears to be based solely on the Company's corporate governance structure. In other words, Plaintiff is alleging that the committee members reviewed the documents because that is what they were supposed to do. For the reasons stated above, such an allegation is insufficient. If Plaintiff is actually alleging that the Audit Committee in fact reviewed those documents, Plaintiff's allegations are still insufficient because they provide no details, such as when the review took place and whether the review of the documents occurred once or was spread out over several meetings. Without these facts, Plaintiff's bald allegation that the Audit Committee members "reviewed" the documents is inadequate especially where, as here, two of the six current board members that are former or present member of the Audit Committee, Defendants Dean and Baker, joined the committee in only 2006 and 2009, respectively. Plaintiff fails to explain how his implicit allegation that Dean and Baker reviewed the 2004 OIG report as Audit Committee members is consistent with the allegation that they did not become Audit Committee members until years after the report was issued.

Plaintiff also argues that demand is excused because the Board conducted a 2004 "internal investigation" into the Company's "mortgage lending practices." (Dkt. No. 63 ¶ 133.) The "internal investigation" was spurred by a shareholder request that the Board study ways of linking executive compensation to successfully addressing predatory lending practices. In recommending a "no" vote in the Company's proxy statement, the Board stated that "[t]he Company . . . maintains comprehensive monitoring and audit procedures to ensure compliance with fair lending laws and corporate policy." (*Id.*) Plaintiff asserts that the "Board was actively investigating the Company's lending practices" and, thus, was "certainly not ignorant of the significant issues surrounding Wells Fargo's FHA lending practices." (Dkt. No. 72 at 17.) While the Board may have investigated its lending practices in regards to predatory lending, it does not follow that such an investigation

included its FHA lending practices, let alone that it would uncover the supposed "red flags" discussed above. Plaintiff does not allege any specific information obtained by the Board as a result of the purported investigation or what directors (if any) received the information. Even if the recommendation was relevant and demonstrated that the Board had knowledge (or supported such an inference) of the FHA violations, it does not establish that demand is futile because only six current Board members were members on March 19, 2004, the time of the recommendation.

The cases upon which Plaintiff relies merely highlight the inadequacy of the FAC. The court *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), found demand excused because the "Complaint detail[ed] at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it." 722 F. Supp. 2d at 460. Further, the reports were made during the period when the board was obligated by multiple corporate integrity agreements ("CIA") to "pay special attention" to the very problems identified by the reports. *Id.* at 461. Indeed, one CIA "obligated Pfizer's Chief Compliance Officer to report directly to the board . . . allegations of misconduct . . . so that the board could deal with them directly, rather than relying on management . . . thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct." *Id.* Further, the plaintiffs alleged "that a majority of the director defendants served on the board for a period that covers the dates of every 'red flag' alleged to have been brought to the Board's attention." *Id.* Here, in contrast, the FAC does not allege reports made to the Board which disclosed the FHA loan wrongdoing. Nor was the Board specially tasked with "paying special attention" to the quality of loans insured by the FHA. And a majority of the Board was not serving during all the different "red flags" identified by Plaintiff. As already observed by another court, *Pfizer* "does not stand for the blanket proposition" that "where there is a functioning corporate governance structure in place and serious misconduct is alleged, knowledge of the Board is established through inference." *La. Mun. Police Emps.' Ret. Sys. v. Hesse*, 2013 WL 4516427, *9 (S.D.N.Y. July 26, 2013).

*Westmoreland County Employee Retirement System v. Parkinson*, 727 F.3d 719 (7th Cir. 2013), is similarly distinguishable. There the CEO and board of a medical device company had actual

15

knowledge that the Food and Drug Administration ("FDA") had repeatedly warned of problems with the company's infusion pump product, and the company had even entered into a consent decree with the FDA regarding the pumps, yet the company refused to address the problems. The derivative plaintiff argued that the board's inaction "'in the face of a clear mandate from the FDA to do more falls squarely into the category of behavior that is so facially egregious that, at the pleading stage, it creates a reasonable inference of bad faith and excuses demand.'" *Id.* at 726. The Seventh Circuit agreed. It held that the plaintiff adequately alleged that "the directors knowingly steered [the medical device company] on a course that was all but certain to prompt the FDA to take enforcement action under the 2006 Consent Decree." *Id.* at 727. Further, the court noted "the complaint alleges particularized facts (e.g., meeting dates and minutes) indicating that the directors were intimately involved in overseeing the remedial effort." *Id.* at 728. Plaintiff's other cases similarly included sufficient allegations of director knowledge about core, material issues. *See, e.g., In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) (publicly known problems with the FDA); *In re Taser Int'l S'holder Derivative Litig.*, 2006 WL 687033 *17 (D. Ariz. Mar. 17, 2006) (knowledge of company's true operating condition); *In re Veeco Instruments, Inc. Secs. Litig.*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. June 14, 2006) (knowledge of export violations that threatened the company's future). There are insufficient particularized facts alleged here to support a reasonable inference that at least half of the current board were "intimately involved" or involved at all, in overseeing Wells Fargo's troubled FHA insurance program.

    The Court is cognizant of Plaintiff's contention that all of its arguments must be considered in their totality; that is, while any one of the identified "red flags" might not have been noticed by the same seven directors and might not, alone, be sufficient to infer knowledge sufficient to give rise to personal liability, when considered together they support a reasonable inference of personal liability of at least seven directors. While the Court agrees that even if any single "red flag" is not itself sufficient, when considered with other facts it might raise a sufficient inference of wrongdoing, Plaintiff's analysis skips an important step. Plaintiff must allege the particular facts that give rise to a substantial likelihood of liability of at least seven directors. This requires the Court to determine separately as to each director what each director was likely to know based on the FAC's allegations.

16

For the reasons explained above, the FAC does not allege facts sufficient to give rise to a reasonable inference that any director was aware of the wrongdoing and intentionally turned a blind eye; indeed, the FAC lumps all the directors together without separately alleging what each director was likely to know. Plaintiff's theory appears to be that if any director was aware of the wrongdoing, he or she must have made all directors aware. The law does not support such a broad inference.

Because Plaintiff's FAC fails to allege particularized facts that raise a reasonable doubt that at least seven members of the current Board of Directors could have properly exercised his or her independent and disinterested business judgment in responding to a demand, Plaintiff's FAC is dismissed.[2]

## B.  Whether Leave to Amend Should be Granted

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted).

The Court has already granted leave to amend once. (See Dkt. No. 57 at 15.) Plaintiff now requests "the Court's guidance" and leave to amend because "he can add, among other things, additional facts arising from the [SDNY] Action, including from the . . . Order on Wells Fargo's motion to dismiss entered just three days prior to the filing of [Plaintiff's Opposition] brief, and additional documents underlying the government's claim." (Dkt. No. 72 at 25.) Defendants insist that the Court has explained to Plaintiff "in every way possible that, in order to properly plead demand futility, Plaintiff must set forth particularized facts connecting the Board to the alleged regulatory violations," and that Plaintiff's request ignores "the detailed guidance this Court provided." (Dkt. No. 73 at 15.) With respect to the SDNY Order, Defendants urge that three days is ample time to review it and incorporate any new allegations into Plaintiff's Opposition (which, according to Defendant, Plaintiff in fact did).

The Court has reviewed the SDNY Order, which Plaintiff submitted with his Opposition, and

---

[2] In reaching this conclusion, the Court rejects, again, Defendants' argument that Wells Fargo's exculpatory clause enhances Plaintiff's pleading burden for the reasons explained in its previous Order. (Dkt. No. 57 at 5-7.)

17

does not find anything in the Order that suggests Plaintiff can cure the defects in his allegations. The SDNY action is brought against Wells Fargo only, not any individuals, let alone any current outside directors. Indeed, one issue on the motion to dismiss was whether a particular claim could be brought against Wells Fargo only or whether the United States had to allege facts sufficient to state a claim against bank insiders, which it had not done. The court held that Plaintiff could state a claim against Wells Fargo only. (Dkt. No. 74-2 at 49-53.) Further, the SDNY action alleges misconduct from 2001 through 2005; however, only six current Wells Fargo directors joined the Board prior to 2005. Thus, the SDNY Order does not help Plaintiff with alleging facts that show that at least seven of the current directors face a substantial likelihood of personal liability.

At oral argument Plaintiff also argued that the Court should give Plaintiff a few months to file an amended complaint because a different shareholder—not Plaintiff here—has requested certain documents from Wells Fargo as is his right. Of course, as a shareholder Plaintiff Gulbrandsen also has that right and he offers no explanation for why he himself has not sought such documents given that this action was filed more than one year ago.

At bottom, then, Plaintiff does not contend that he is currently aware of any additional facts that he could allege relevant to the demand futility inquiry. In light of the age of this case, and the significant motion practice that has already occurred, the Court declines to stay the case to give a different shareholder the opportunity to obtain documents that may or may not support Plaintiff's theory of individual liability. Accordingly, Defendants' motion to dismiss shall be granted without leave to amend. *See In re Silicon Graphics*, 183 F.3d at 990–91 (a complaint may be dismissed with prejudice on account of the plaintiff's failure to satisfy the demand requirement where he does not identify any additional fact he could allege to save his complaint), *superseded by statute on other grounds*.

**C.     Defendants' Other Arguments**

Because the Court has concluded that Plaintiff has still not properly pled demand futility, and has therefore dismissed the FAC without leave to amend, it need not and shall not consider Defendants' additional arguments for dismissal. *Potter*, 546 F.3d at 1055.

18

**CONCLUSION**

For the reasons explained in this Order, and the Court's previous dismissal order, Plaintiff has not alleged facts sufficient to show that at least seven of the current Wells Fargo directors face a substantial likelihood of personal liability. Accordingly, Defendants' motion to dismiss is granted without leave to amend.

The Clerk is directed to close the case.

**IT IS SO ORDERED.**

Dated:  December 6, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE